NO. 4-09-0726          Filed 6/28/10

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: the Marriage of | ) | Appeal from |
| DANIEL A. NORD, | ) | Circuit Court of |
|     Petitioner-Appellant, | ) | McLean County |
|     and | ) | No. 06D561 |
| KATHLEEN A. NORD, | ) | |
|     Respondent-Appellee. | ) | |
| | ) | Honorable |
| | ) | David W. Butler, |
| | ) | Judge Presiding. |

_____

JUSTICE POPE delivered the opinion of the court:

This appeal concerns an award of maintenance entered during marriage dissolution proceedings between petitioner, Daniel A. Nord, and respondent, Kathleen A. Nord. All other issues have been resolved and are not part of this appeal.

On appeal, Daniel argues the trial court (1) abused its discretion when it awarded Kathleen permanent maintenance of $17,000 per month and (2) made significant factual errors which warrant reversal of the maintenance award. We disagree and affirm.

I. BACKGROUND

The parties married in December 1972. They had two children who are now adults. Daniel, age 57 at the time of the February 2009 hearing, is a physician practicing in the field of obstetrics and gynecology. Kathleen, age 58, is a high school

graduate. Kathleen worked as a teacher's aide, in a real estate office filing paperwork, and for a patent attorney while Daniel was in medical school. However, Kathleen ceased working in 1980 to stay home and care for the parties' two children. As a result, Kathleen has not worked outside the home in approximately 30 years.

The parties purchased the marital residence for approximately $485,000, and during the marriage they made approximately $1 million worth of improvements to the home. Their 12,000-square-foot, three-floor home contained nine bathrooms, four bedrooms, a six-car garage, an indoor half-court gymnasium, and an in-ground pool. The parties' other properties included eight timeshares in Cancun, a timeshare in Missouri, and a second home in Guadalajara, Mexico, valued at $545,000. The parties, during their marriage, not only traveled extensively to Mexico, but also traveled to Australia, New Zealand, and to Europe on several occasions. Kathleen and her daughter also traveled to Africa and Japan during the marriage.

According to the trial testimony, the parties separated sometime between late July and early August 2006. Prior thereto, they sold their home for approximately $1,600,000 and moved into a $5,600-per-month rental home. The revenue from the sale of the home, furnishings, and artwork (the parties received $700,000 for furnishings and artwork) amounted to approximately $2,300,000.

In November 2006, Daniel filed a petition for dissolution of marriage.  Prior to the hearing on Daniel's petition, the parties reached agreement on the distribution of the marital and nonmarital property.  While the parties agreed with respect to who was to receive the various properties, they did not agree on the values to be assigned to some of the properties.  Nor did the parties agree with respect to the amount and duration of maintenance for Kathleen.  The parties' "Property Settlement Agreement" included four exhibits that itemized the agreed distribution of the marital and nonmarital property and debt to each party and set forth each party's assigned values to each item of property.  Significant discrepancies existed in the values assigned to two items of property.  The parties agreed Daniel's 10% interest in Nord Farms, Inc. (Nord Farms), was his nonmarital property.  Daniel valued his interest in Nord Farms at $152,280, while Kathleen valued it at $705,125.  The second significant discrepancy arose with respect to the value of a marital asset, a 50% interest in Daniel's obstetrics practice, Nord, Wellman Obstetrics & Gynecology, SC.  While the parties agreed this marital asset should be assigned to Daniel, Kathleen valued it at $700,000 and Daniel valued it at $135,000.

In February 2009, over the course of 2 1/2 days, the trial court heard evidence concerning these property values and the parties' arguments regarding maintenance.  The parties agreed

Kathleen was entitled to maintenance but disagreed as to the amount and duration. To be able to establish an appropriate amount of maintenance, the court needed to determine the value of these properties, in addition to determining the prospective incomes of the parties. Daniel argued he could not pay more than $5,000 per month for 60 months. Kathleen, on the other hand, initially sought permanent maintenance of $31,000 monthly, a figure her counsel modified to $21,000 during closing argument. At the end of the hearing, the court took the matter under advisement.

In a June 2009 written order, the trial court found that "to meet Kathleen's reasonable needs in light of the standard of living established during the marriage and in light of Daniel's ability to pay, Daniel should pay Kathleen [permanent] maintenance in the amount of $17,000 per month."

On July 13, 2009, the trial court entered a final judgment for dissolution of marriage.

On July 21, 2009, and July 23, 2009, Daniel filed motions to reconsider and to correct factual errors. Following a September 2009 hearing, the trial court denied both motions.

This appeal followed.

## II. ANALYSIS

On appeal, Daniel argues the trial court's permanent-maintenance award of $17,000 per month was an abuse of discretion

where the trial court made significant factual errors. Specifically, Daniel contends (1) his resources are insufficient to pay the maintenance award, (2) $17,000 per month was not necessary for Kathleen's reasonable expenses, (3) his actual expenses were not considered, (4) Kathleen received the bulk of the marital assets, and (5) $5,000 per month for 60 months would adequately support Kathleen.

Kathleen argues the trial court's award was not an abuse of discretion. Specifically, she contends (1) Daniel has the ability to pay the maintenance awarded and his argument to the contrary is not supported by the evidence presented at trial, (2) Daniel's income is able to provide for her reasonable expenses while also providing a comfortable lifestyle for himself, and (3) given her age, educational level, and 30-year absence from the workforce as well as the duration of the marriage (37 years), permanent maintenance is justified and necessary.

## A. Standard of Review

"As a general rule, 'a trial court's determination as to the awarding of maintenance is presumed to be correct.'" In re Marriage of Heroy, 385 Ill. App. 3d 640, 650, 895 N.E.2d 1025, 1037 (2008), quoting In re Marriage of Donovan, 361 Ill. App. 3d 1059, 1063, 838 N.E.2d 310, 314 (2005). The amount of a maintenance award lies within the sound discretion of the trial

court, and this court must not reverse that decision unless it was an abuse of discretion.  In re Marriage of Schneider, 214 Ill. 2d 152, 173, 824 N.E.2d 177, 189 (2005).  An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court.  Schneider, 214 Ill. 2d at 173, 824 N.E.2d at 189.  The party seeking reversal of a maintenance award bears the burden of showing the trial court abused its discretion.  Schneider, 214 Ill. 2d at 173, 824 N.E.2d at 189.

B. The Statutory Factors

Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) sets forth the following 12 factors for a trial court to consider in deciding whether to grant a maintenance award:

"(1) the income and property of each party, including marital property apportioned and non[]marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or

- 6 -

delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court

expressly finds to be just and equitable."

750 ILCS 5/504(a) (West 2008).

In considering these factors, the trial court is not required to give them equal weight "so long as the balance struck by the court is reasonable under the circumstances." In re Marriage of Miller, 231 Ill. App. 3d 480, 485, 595 N.E.2d 1349, 1353 (1992). "Although the trial court must consider all the relevant statutory factors, it need not make specific findings as to the reasons for its decisions." In re Marriage of Reynard, 378 Ill. App. 3d 997, 1004, 883 N.E.2d 535, 541 (2008). "The benchmark for determining the amount of maintenance is the recipient's reasonable needs in light of the standard of living established during the marriage." In re Marriage of Culp, 341 Ill. App. 3d 390, 398, 792 N.E.2d 452, 459 (2003)

## C. Alleged Factual Errors

Daniel argues Kathleen's maintenance award was erroneous in light of the significant factual errors the trial court made in determining the award.

When a party challenges a trial court's factual findings regarding a maintenance determination, this court will not reverse a trial court's findings unless the findings are against the manifest weight of the evidence. In re Marriage of Walker, 386 Ill. App. 3d 1034, 1041, 899 N.E.2d 1097, 1103

(2008). Findings are "against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." In re Marriage of Bhati, 397 Ill. App. 3d 53, 61, 920 N.E.2d 1147, 1153 (2009).

Daniel contends the trial court erroneously (1) failed to consider Kathleen's total income potential; (2) overvalued Daniel's income where it failed to consider some of his income was nonrepetitive capital gains and gambling income; (3) failed to recognize Daniel's continuing marital debt burden; and (4) overvalued Daniel's estate by $948,286 where it (a) believed he received $841,000 more property than is reflected in the property settlement agreement, (b) did not properly consider the amount of debt Daniel assumed, and (c) erred in valuing Daniel's 10% interest in Nord Farms, where the court's calculation included too many acres. As a result, Daniel maintains the court's findings of fact were against the manifest weight of the evidence and merit reversal of the maintenance award.

Kathleen argues the alleged factual errors made by the trial court do not warrant reversal. Specifically, Kathleen contends the court did not (1) fail to consider Kathleen's total income potential, (2) overvalue Daniel's income, (3) err in considering the marital debt assumed by Daniel, (4) overvalue Daniel's estate, or (5) err in valuing Daniel's 10% interest in

Nord Farms.

### 1. Kathleen's Income Potential

Daniel contends the trial court erred where it failed to consider Kathleen's potential annual income of $66,503. Specifically, he contends the court did not consider (1) Kathleen's nonmarital farm's annual earning potential of $23,503, (2) the Guadalajara condo's potential rental income of $30,000, (3) and her potential salary of $13,000 at a minimum-wage job.

In the trial court's written decision, it reviewed each of the section 504(a) factors set forth above and methodically considered the evidence applicable to each factor. It recognized Kathleen received income from her nonmarital farmland (approximately $2,300 per year) and considered the potential rental income from the Guadalajara condominium Kathleen received pursuant to the parties' property settlement agreement. (The parties' daughter was living in this condominium until her expected graduation from medical school in June 2009.) Kathleen also received a 50% interest in 80 acres of McLean County farmland. While recognizing the income potential of the nonmarital farm, the McLean County farmland, the Guadalajara condominium, and the six one-week timeshares owned by Kathleen, the court found neither side produced sufficient evidence for it to make a credible determination of the total income to be generated from these assets. The court also noted requiring

- 10 -

Kathleen to use these assets entirely for the generation of income would impair the value those assets contributed to her standard of living prior to the dissolution. Last, the court considered Kathleen's potential to earn income at a minimum-wage level approximating $13,000 annually but noted this income would be taxed at a higher rate when added to the maintenance award.

Thus, contrary to Daniel's argument, the record shows the trial court <u>did</u> consider Kathleen's potential income from (1) the nonmarital farmland, (2) the Guadalajara condominium, and (3) minimum-wage employment. However, the trial court was not required to make specific findings regarding the amount of income Kathleen's assets could produce. <u>Heroy</u>, 385 Ill. App. 3d at 656, 895 N.E.2d at 1041-42, citing <u>In re Marriage of Zeman</u>, 198 Ill. App. 3d 722, 733, 556 N.E.2d 767, 773 (1990) (rejecting the ex-husband's argument that the trial court failed to consider the income potential of the ex-wife's property even though the trial court made no calculations). Moreover, while Daniel argues specific amounts may be generated from these assets, they have no proven income stream. The fact the court did not determine with mathematical precision the income from these assets does not mean it failed to consider this factor when determining the maintenance award. <u>In re Marriage of Mittra</u>, 114 Ill. App. 3d 627, 632, 450 N.E.2d 1229, 1232 (1983).

## 2. Daniel's Income

Daniel argues the trial court's assertion his "average income was approximately $1,100,000 per year for the years 2002 through 2008" shows the court overstated his income by failing to consider nonrepetitive capital gains and gambling income. We disagree.

According to the parties' tax returns, Daniel's total gross income was $994,507 in 2002, $1,162,517 in 2003, $1,655,786 in 2004, $1,669,178 in 2005, $1,576,942 in 2006, and $898,827 in 2007. In addition, petitioner's exhibits show Daniel's total gross income for 2008 was $813,031. As a result, Daniel's average income for 2002 to 2008 was over $1 million.

During the hearing on the motion to reconsider, the trial court stated the following:

"I did mention, and it's true, you can't quarrel with the numbers that the average, the average came out to roughly 1.1 million between [2002] and [2008]. That's a fact.

But obviously, I did not reach the conclusion that we can be sure that in future years Daniel's net income or gross income would be 1.1 million. Be assured if I thought he was going to gross 1.1 million a year, maintenance would probably have been higher."

Daniel maintains the average should not reflect his nonrepetitive capital gains of $328,963 in 2006, $336,593 in 2005, $59,486 in 2004, $120 in 2003, and $5,861 in 2002. However, Daniel concedes no capital gains occurred in 2007 and 2008. The record shows the trial court based the maintenance award on Daniel's earnings during those last two years, stating, "I sort of gave him the benefit of the doubt and concluded that the last two years are, are a better representation of what his future income is likely to be--somewhere in the $800,00--[$]813,[000] one year and I think [$]834,[000] the next."

In this case, the trial court based its maintenance award on Daniel's 2007 and 2008 average income of approximately $800,000. As a result, the court did not overstate Daniel's income by failing to consider the nonrepetitive nature of some of Daniel's income occurring from 2002 to 2006.

### 3. Daniel's Marital Debt

Under the settlement agreement, Daniel assumed the bulk of the parties' marital debt in excess of $800,000, including a consolidation loan agreement with Busey Bank in the amount of $534,000. Daniel contends the trial court erred where no factual basis existed for the court's findings that (1) he would be debt-free in less than three years and (2) Daniel had negotiated the payment arrangement and created the situation where most of his income was currently being applied to debt.

In its opinion, the trial court noted the following:

"Daniel argues that his needs are significant because of the amount of money he spends each month to repay [the marital] debt.  At trial[,] Daniel testified that the minimum payment on this debt is approximately $32,500.00 a month.  *** Daniel was solely responsible, as between the parties, for negotiating the payment arrangements of the parties' outstanding debt.  If Daniel continues to pay the debt at the amount testified to, he will be debt free in less than 3 years."

Daniel claimed at trial his minimum monthly payments on the debts totaled $32,500.  Consequently, Daniel argues, he has limited funds available for the payment of maintenance.  However, as the trial court noted in its written decision, Daniel handled the parties' finances, including the debt-repayment schedule.  His Busey Bank loan was amortized over 48 months, and by the February 2009 hearing, the principal had already been reduced by $100,000.  As the court pointed out, if Daniel amortized his debts over a longer period of time, he could readily afford to pay significant maintenance.  Daniel created this aggressive debt-repayment schedule, tying up the bulk of his monthly income

in the repayment of debt.  Kathleen should not be penalized as a result.

Daniel also argues the trial court failed to consider the federal and state income-tax liabilities resulting from Daniel's failure to timely pay his quarterly taxes and his failure to have sufficient sums withheld from his salary to pay his tax obligations.  Specifically, Daniel argues the 2008 federal and state taxes had accrued and were due and owing but were not included in the marital debt.  We note that according to Daniel, at the time of the hearing, he had paid off the 2006 and 2007 tax liabilities through a bank loan, which was counted as part of the $841,466 total debt Daniel assumed.

As Kathleen points out, the record shows the 2008 federal and state taxes were in fact included in the parties' marital debt of $841,446, which the court considered.  Exhibit C of the parties' property settlement agreement shows a 2008 tax liability of $143,680.  During the hearing, Daniel also testified he made two payments totaling $50,000 toward the 2008 tax debt.  The court stated it considered the $841,466 debt, which Daniel agreed to assume.  It also heard Daniel's testimony regarding his payments toward the 2008 taxes.  As a result, Daniel's argument the court did not consider his outstanding tax liabilities fails.

### 4. The Value of Daniel's Estate

Daniel first argues the trial court erroneously

overvalued Daniel's estate by $948,286 where it (1) believed he received $841,000 more property than is reflected in the property settlement agreement and (2) overvalued Daniel's 10% interest in Nord Farms by a minimum of $137,747.

On February 23, 2009, the parties filed their property settlement agreement.  Exhibits attached to the agreement showed the marital and nonmarital property each party is to receive and the value each party believes should be assigned to that property.  The following is a summary of the total value assigned by each party to the marital and nonmarital property distributed to each party (as reflected in the trial court's opinion):

|  | Daniel's Values | Kathleen's Values |
|---|---|---|
| Daniel's Nonmarital Property | $152,280 | $705,125 |
| Kathleen's Nonmarital Property | $501,443 | $474,020 |
| Daniel's Marital Property | $449,263 | $748,078* |
| Kathleen's Marital Property | $1,961,543 | $1,880,274 |
| Daniel's <u>Total</u> Nonmarital Property and Marital Property | $601,543 | $1,453,203 |
| Kathleen's <u>Total</u> Nonmarital Property and Marital Property | $2,462,976 | $2,354,294 |

* $330,000 of goodwill deducted at trial from Kathleen's original figure of $1,078,078.

Thus, as can be seen from the chart above, Daniel and

- 16 -

Kathleen basically agreed on the value of property assigned to Kathleen, but were over $850,000 apart on the values they each assigned to Daniel's property.

In its memorandum, the trial court points out that the areas in contention are the values of Daniel's nonmarital property, consisting of a 10% interest in Nord Farms and Daniel's 50% interest in his medical practice. Daniel values his interest in Nord Farms at $152,280, whereas Kathleen values it at $705,125. Daniel values his interest in the medical practice at $135,000. Kathleen believes its value to be $370,000, after conceding personal goodwill in the amount of $330,000 should not be included in the value because she is seeking an award of maintenance.

In its memorandum, the trial court found neither party's appraisal with regard to the Nord Farm property to be realistic. The court found Kathleen's appraisal too high, but also found Daniel's appraisal to be too low. Finding neither the $2,800- (Daniel's) nor $13,000- (Kathleen's) per-acre figure to be credible, the court found a more realistic value for Daniel's 10% interest in Nord Farms to be between $300,000 and $400,000. The court then substituted its value of $350,000 (calculated as the midway point between $300,000 and $400,000) for the values used by the parties for Daniel's 10% interest in Nord Farms. Following this adjustment, Daniel's total nonmarital and marital

property was valued as follows:

|  | Daniel's Values | Kathleen's Values |
|---|---|---|
| Daniel's Total Nonmarital Property and Marital Property | $799,263 | $1,098,078 |

With regard to Daniel's 50% interest in his professional practice, the trial court found the following:

> "Initially, Kathleen valued this asset at $700,000.00. At trial[,] Kathleen's counsel revised this figure to $370,000.00, acknowledging that Daniel's personal goodwill should not be included in the value of his professional practice. Daniel has placed a value of $135,000.00 on his professional practice. ***
>
> The court has assessed the credibility of the exhibits and testimony concerning the value of Daniel's professional practice and finds that Daniel's figure is more credible and accepts $135,000.00 as being the value of Daniel's 50% interest in [his professional practice.]"

The court then subtracted the difference between the parties' valuations for his professional practice ($370,000 minus

$135,000, or $235,000) from the value Kathleen placed on Daniel's total marital and nonmarital property and modified that figure to $863,078 (i.e., $1,098,078 minus $235,000) to arrive at the following values for their nonmarital and marital property:

| | Daniel's Values | Kathleen's Values |
|---|---|---|
| Daniel's Nonmarital Property (Nord Farms) | $350,000 | $350,000 |
| | Daniel's Values | Kathleen's Values |
| Kathleen's Nonmarital Property | $501,443 | $474,020 |
| Daniel's Marital Property | $449,263 | $513,078 |
| Kathleen's Marital Property | $1,961,543 | $1,880,274 |
| Daniel's Total Nonmarital Property and Marital Property | $799,263 | $863,078 |
| Kathleen's Total Nonmarital Property and Marital Property | $2,462,976 | $2,354,294 |

In its order, the trial court referenced the above figures and stated the following:

"The court notes that the actual amount of property received by Daniel is $841,446.00 more than what appears above because the property figures are net figures which are arrived at by taking the total amount of property received and subtracting the amount

- 19 -

of debt assumed by that party.  Similarly, the amount of property received by Kathleen was actually $47,280.00 more than the net figure reflected above because she assumed $47,280.00 in debt."  (Emphasis added.) Later in its order, the trial court stated the following:

"Daniel will receive between $800,000.00 to $860,000.00 in property.  Daniel points out that as part of the agreement he has agreed to pay $841,000.00 in marital debt. As the court has previously noted, the property figures are net figures and the total amount of property actually received by Daniel is $841,000.00 more.  *** Daniel argues that he is not able to pay a significant amount of spousal support because of [the marital] debt.  The court has considered the reduction in the amount of property he receives as a result of this debt.  To find that both he has received considerably less property and has considerably more debt would be in effect double counting the debt."  (Emphases added.)

- 20 -

Based on the above-cited passages, Daniel argues the trial court erred in finding he received $841,000 more property than is reflected in the property settlement agreement.

During the hearing on Daniel's motion to reconsider, however, the trial court clarified its written order and stated the following:

"It wasn't the [c]ourt's suggestion in this opinion that [Daniel's] net asset was [$]841,000 more. The [c]ourt was simply making an observation of the obvious--that if you, whether you use the term 'net worth' or in the case of a divorce 'net assets,' you start out with the total property and you subtract from that total debt to get the net.

If you have a thousand dollars worth of property and you have two hundred dollars worth of debt, you have eight hundred dollars worth of net property.

The only point I was making there, and I made this exact same observation with regard to Kathleen. The only point I'm trying to make is that the parties were arguing net figures, but in terms of having property available which could be used to dispose of

debt, I'm also looking at the total amount of property each party received; and that came right from the parties' own figures in the marital settlement agreement.

＊＊＊

[S]o, don't misread the observations in the opinion as thinking the [c]ourt was mistakenly under the belief that [Daniel] has $841,000 of more net property."

Thereafter, the following colloquy took place between Daniel's counsel and the trial court:

"MR. WEINTRAUB [(Daniel's Attorney)]: Well judge, why don't you state that in your opinion then?  Why don't you state in your opinion, 'This is what I intended,' and, you know, just correct your opinion and state that as opposed to what you actually stated on pages six, nine[,] and ten, which I believe will be totally misconstrued by an [a]ppellate [c]ourt.

State in your opinion, 'Here is what I intended,' and then I can argue to the [c]ourt, 'All right, look.  My client has $846,000 in debt.  He has got $831,000 of

- 22 -

property found by the [c]ourt,' your own finding, 'which basically leaves him with a zero estate.'

But, you know, if you're going to state that, Judge, state that. State what you said this morning in a corrected ruling as opposed to what you stated on pages six, nine, and ten.

[THE COURT:] Well, I'm not going to amend the opinion. I said exactly what I meant, and I think it's clear as a bell.

If you have read something into that, I guess you can make a record of what you thought I meant, but I think the language is clear. It's simply an observation of what is available to the parties to either reduce debt or use to support their lifestyle.

I made the exact same observation as to Kathleen, but we're talking about much smaller debt numbers. But I made the same observation, and that's all that was intended, is to identify the total amount of property available to each side.

I understand his net property is

[$]841,000 less. I don't think anybody could read this opinion and misconstrue the meaning of that."

We understand the trial court's statements to mean only what it said--that the total value of the property distributed to the parties was a _net_ value, _i.e.,_ the debt distributed to each party was subtracted from the total value of all property distributed to each party and this "net" figure is reflected in the parties' exhibits attached to the property settlement agreement and in the court's order. The court made it clear during the hearing on Daniel's motion to reconsider that it "was not mistakenly under the belief that [Daniel] has $841,000 of more net property." Moreover, the court clearly acknowledged Daniel's net assets did not amount to $841,000 more than the amount of property he received. Upon review of the record, we find no basis for Daniel's argument on appeal. As a result, Daniel's argument the court overvalued his estate by $841,000 fails.

### 5. Value of Nord Farms

Daniel next contends the trial court erroneously overvalued Daniel's 10% interest in his nonmarital farmland. Specifically, Daniel contends the court erred in stating in its opinion that the total acreage of the farmland appraised was 541.24 acres. Instead, Daniel maintains the court's opinion

included acreage not owned by Nord Farms, and the correct amount was 328.32 total acres. As a result, Daniel argues the court overvalued his 10% interest by at least $137,747--based upon the court's apparent determination the land was worth $6,467 per acre ($350,000 value divided by 54.24 acres equals $6,467). In reality, however, the court did not assign a per-acre value to Nord Farms. Even Daniel's expert testified different tracts of the farm carried different values as a result of different uses. Some of the land was commercial, some was residential, and some was agricultural.

Kathleen appears to concede the trial court's determination of the amount of land at issue was incorrect but argues this error was harmless. Specifically, Kathleen contends Daniel has failed to show any prejudice resulting from the miscalculation.

According to James Riker, Daniel's land appraiser, the the total amount of land comprising Nord Farms is 328.32 acres. The amount of acreage reflected in Donald Cochran's report (Kathleen's land appraiser) was 417.92 total acres. In its written opinion, the trial court stated the following:

> "The total number of acres of which
> Daniel owns 10% is 541.24. While the court
> is not in the position to substitute its
> judgment for that of certified appraisers,

the court agrees with Daniel that Kathleen's appraisal is too high and the court agrees with Kathleen that Daniel's appraisal is too low. Neither $2,800.00 nor $13,000.00 per acre appear to be credible figures. It is the court's judgment that a more realistic [figure] for the value of Daniel's 10% interest in Nord Farms, Inc. is between $300,000.00 and $400,000.00."

In this case, the trial court erred by stating Nord Farms consisted of 541.24 total acres, where Riker's testimony showed it consisted of 328.32 total acres, a difference of 212.92 total acres, and Cochran's report showed it was 417.92 acres, a difference of 123.32 acres. However, we find the court's calculation error immaterial.

According to Riker, the value of Daniel's 10% interest in Nord Farms was $152,280. According to Cochran, the value of Daniel's 10% interest was $705,125. In its opinion, the trial court valued Daniel's 10% interest at $350,000. An examination of Daniel's 10% interest in the farmland, as opposed to the total acreage, shows the court erred by either counting just either 21.29 or 12.33 additional acres (10% of 212.92 or 123.32 acres erroneously included).

This error is especially insignificant (1) when

compared to the total marital property accumulated during the marriage and (2) in relation to the issue of maintenance, which in this case is more a function of Daniel's annual income than his nonmarital property. See, e.g., In re Marriage of Toole, 273 Ill. App. 3d 607, 617, 653 N.E.2d 456, 463-64 (1995) (finding while the trial court made an $11,000 valuation error, the error was harmless in light of the entire distribution scheme of the estate valued at $136,503); In re Marriage of Weinstein, 128 Ill. App. 3d 234, 248, 470 N.E.2d 551, 562 (1984) (finding the trial court's possible $4,300 valuation error harmless where the estate was valued at $115,000); see also 750 ILCS 5/504(a)(1) (West 2008) (a factor to consider when determining maintenance is "the income and property of each party, including marital property apportioned and non[]marital property assigned to the party seeking maintenance").

We note it would have been within the trial court's discretion to have accepted as credible Kathleen's expert's opinion that the land was worth $13,000 per acre. See In re Marriage of Reppen-Sonneson, 299 Ill. App. 3d 691, 693, 701 N.E.2d 1159, 1160 (1998) (conflicts in testimony regarding the value of assets are matters for the trier of fact, and a valuation within the range testified to by the parties' experts will not be disturbed on review). Thus, the court could have valued Daniel's 10% interest at $426,790 ($13,000 multiplied by

32.83 acres) or even $543,270 ($13,000 multiplied by 41.79 acres) without having abused its discretion.

Morever, at the conclusion of the hearing on the motion to reconsider, the trial court stated the following:

> "So the [m]otion to [r]econsider will be denied, and as far as correcting the factual errors, I think I disagree that some of those are errors.  And <u>the</u> <u>one</u> <u>potential</u> <u>error</u> <u>may</u> <u>be</u> <u>in</u> <u>the</u> <u>amount</u> <u>of</u> <u>acres</u> <u>involved</u> <u>in</u> [<u>Nord</u> <u>Farms</u>], <u>but</u> <u>I</u> <u>still</u> <u>think</u> <u>the</u> <u>[c]ourt's</u> <u>estimate</u> <u>of</u> <u>the</u> <u>value</u> <u>is,</u> <u>is</u> <u>reasonable</u>.
>
> I don't know if we can ever put an exact dollar figure on it, and obviously two experts didn't necessarily agree, if they did agree on the number of acres.  But I think that's a fair assessment, and <u>if</u> <u>I</u> <u>overvalued</u> <u>that</u> <u>asset</u> <u>by</u> <u>$137,000</u> <u>it</u> <u>would</u> <u>not</u> <u>affect</u> <u>the</u> <u>[c]ourt's</u> <u>judgment</u>."  (Emphases added.)

As a result, we find the trial court's valuation error harmless.

D. The Amount of Maintenance Awarded

In this case, the parties lived an extravagant lifestyle.  They enjoyed luxury automobiles such as Mercedes, Lexus, Jaguar, Porsche, and Rolls-Royce.  Kathleen routinely

shopped at stores such as Saks Fifth Avenue and Neiman Marcus. The parties had employed multiple servants at both their Bloomington and Guadalajara homes. The parties regularly entertained friends and dignitaries in their home. They also traveled and vacationed in Australia, New Zealand, Europe, Mexico, Africa, and Japan.

The parties were married for approximately 34 years before the initiation of these proceedings. While Kathleen received a larger portion of the marital estate (between $1,888,274 and $1,961,543) than Daniel (between $449,263 and $513,078), Daniel has the greater present and future potential to earn income and acquire assets. Kathleen, who was 58 years old at the time of the hearing, has a high school education, little job experience, and has not worked outside the home in 30 years. The trial court based its maintenance award on Daniel's 2007 and 2008 average income of approximately $800,000 per year. The court awarded Kathleen $17,000 per month, or $204,000 per year in maintenance. Thus, Kathleen's maintenance represents approximately 25.5% of Daniel's income.

Daniel argues, however, that the award is reversible under In re Marriage of Bratcher, 383 Ill. App. 3d 388, 390, 890 N.E.2d 1232, 1234 (2008). In Bratcher, this court reversed a $12,500-per-month maintenance award where the wife was awarded an equalizing lump-sum payment of $876,759 and commercial property

valued at $725,000.  Bratcher, 383 Ill. App. 3d at 388-89, 890 N.E.2d at 1233.  However, this case is distinguishable from Bratcher.  The court in Bratcher found the ex-wife's income combined with the awarded maintenance would have resulted in $26,500 monthly for the ex-wife, leaving the ex-husband with $14,500 monthly.  Bratcher, 383 Ill. App. 3d at 389, 890 N.E.2d at 1234.  Morever, in Bratcher, the ex-wife was awarded an asset with a proven income stream of approximately $8,193 per month, or almost $100,000 per year.  Bratcher, 383 Ill. App. 3d at 389, 890 N.E.2d at 1233-34.

In this case, despite Daniel's argument to the contrary, the condominium and the marital farmland have only speculative income-producing potential.  As previously stated, the fact the trial court did not determine with mathematical certainty the income-generating potential of Kathleen's assets does not mean it failed to consider this factor in awarding maintenance.  Mittra, 114 Ill. App. 3d at 632, 450 N.E.2d at 1232.  Moreover, "'where the spouse from whom maintenance is sought has sufficient income to meet his own needs while meeting those of his spouse, the spouse seeking maintenance is not required to sell her assets or impair her capital in order to maintain herself in the manner established during the marriage.'" (Emphasis omitted.)  In re Marriage of Mayhall, 311 Ill. App. 3d 765, 768, 725 N.E.2d 22, 25 (2000), quoting In re Marriage of

- 30 -

Thornton, 89 Ill. App. 3d 1078, 1088, 412 N.E.2d 1336, 1344 (1980). The court's order reflects its careful consideration of each applicable factor to be considered under sections 504(a)(1) through (a)(12) (750 ILCS 5/504(a) (West 2008)). While Kathleen originally sought $31,000 per month and Daniel sought to pay only $5,000 per month, the court found both of these figures unrealistic in light of the facts of this case. The court did not abuse its discretion in awarding Kathleen $17,000 per month in maintenance.

### E. The Duration of Maintenance

Daniel last argues the trial court erred by awarding Kathleen permanent maintenance of $17,000 per month. Instead, Daniel contends Kathleen should be awarded $5,000 per month for five years. Daniel thus argues the court erred by awarding Kathleen permanent maintenance as opposed to rehabilitative maintenance.

"Permanent maintenance should be awarded where a spouse is not employable or is only employable at a lower income as compared to the spouse's previous standard of living." Walker, 386 Ill. App. 3d at 1044, 899 N.E.2d at 1105. Rehabilitative maintenance is appropriate where the spouse is employable at an income that would provide the spouse the approximate standard of living enjoyed during the marriage. In re Marriage of Selinger, 351 Ill. App. 3d 611, 615, 814 N.E.2d 152, 158 (2004). It is

within the trial court's discretion to set the duration of the maintenance award.  Selinger, 351 Ill. App. 3d at 614, 814 N.E.2d at 157.  The trial court is in a better position to determine whether permanent or rehabilitative maintenance was more appropriate.  In re Marriage of Golden, 358 Ill. App. 3d 464, 469, 831 N.E.2d 1177, 1181 (2005), citing In re Marriage of Gunn, 233 Ill. App. 3d 165, 179, 598 N.E.2d 1013, 1022 (1992).  The court's decision to award permanent or rehabilitative maintenance will not be overturned unless the court abused its discretion.  Walker, 386 Ill. App. 3d at 1044, 899 N.E.2d at 1105.

        We note permanent maintenance is not limited to spouses who are unemployable.  See Heroy, 385 Ill. App. 3d at 652-53, 895 N.E.2d at 1038-39 (affirming a maintenance award to the ex-wife who had a law degree and earning potential of more than $100,000 per year).  Permanent maintenance is also appropriate where a spouse is "only employable at a lower income as compared to the spouse's previous standard of living."  Walker, 386 Ill. App. 3d at 1044, 899 N.E.2d at 1105.  "In lengthy marriages in which the recipient of maintenance served as caregiver for the children, '"[t]here is no question but that Illinois courts give consideration to a more permanent award of maintenance to wives who have undertaken to *** raise and support the family."'"  Culp, 341 Ill. App. 3d at 398, 792 N.E.2d at 458, quoting In re Marriage of Drury, 317 Ill. App. 3d 201, 206, 740 N.E.2d 365, 368

(2000), quoting In re Marriage of Rubinstein, 145 Ill. App. 3d 31, 40, 495 N.E.2d 659, 665 (1986).

In this case, Kathleen and Daniel married in 1972, when Kathleen was 21 years old. During the early years of the marriage, while Daniel was in medical school, Kathleen held various jobs. However, since 1980, and with Daniel's agreement, Kathleen stayed home to raise the parties' two children. Kathleen is a high school graduate who has not been employed outside the home since 1980--almost 30 years at the time of the February 2009 maintenance hearing.

During closing arguments, Daniel questioned Kathleen's inability to obtain a job, asking "is it so unreasonable that [Kathleen] work half the hours that her husband works? I mean, I'm not even asking her to work the amount of hours he works. *** Is it so unreasonable to ask that she work at least part of the time when she's in good health and she's the exact same age as [Daniel]?" However, the goal that the spouse obtain employment is balanced against the likelihood that the "spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage." In re Marriage of Stam, 260 Ill. App. 3d 754, 757, 632 N.E.2d 1078, 1080 (1994). "[W]hen the facts make it clear that one spouse is unable to support herself in the manner in which they lived during the marriage, then it is an abuse of discretion to award

only rehabilitative maintenance."  (Emphases omitted.)  <u>In re Marriage of Carpel</u>, 232 Ill. App. 3d 806, 828, 597 N.E.2d 847, 863 (1992).  The record contains no evidence that Kathleen is employable at an income that would provide anything near the approximate standard of living enjoyed during the marriage.  Accordingly, we find no abuse of discretion in the court's decision to award permanent maintenance.

In this case, Daniel has not established the trial court's findings of fact were against the manifest weight of the evidence or its maintenance award was an abuse of discretion.  The court's written findings and orders show it considered all of the section 504 factors and the evidence before it.  Having reviewed (1) the record; (2) the court's detailed, written order; and (3) the parties' property settlement agreement, under the applicable standard of review, we conclude the court did not abuse its discretion by awarding Kathleen permanent maintenance of $17,000 per month.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT and APPLETON, JJ., concur.

- 34 -