NOTICE

Decision filed 05/03/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 160472

NO. 5-16-0472

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| DAVID R. HARMS, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 05-D-1038 |
| | ) | |
| RUTH PARKER, f/k/a Ruth Harms, | ) | Honorable |
| | ) | Julia R. Gomric, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Cates and Overstreet concurred in the judgment and opinion.

**OPINION**

¶ 1 This appeal involves an amendment to the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) that changes the way maintenance is calculated. Prior to 2015, the relevant statute provided a list of factors courts were to consider in determining the propriety, amount, and duration of maintenance. See *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 94 (citing 750 ILCS 5/504(a) (West 2012)). Under the version of the statute now in effect, however, the statutory factors are used to determine the propriety of maintenance, but the amount and duration of maintenance are calculated using guideline formulas unless the court finds that there is a reason to depart from those guidelines. 750 ILCS 5/504(a), (b-1), (b-2) (West 2016); *In re Marriage of Cole*, 2016 IL App (5th) 150224, ¶ 8. At issue in this appeal is whether the new

1

guidelines are applicable in proceedings to modify maintenance that was ordered before the amendment went into effect. We hold that they are not.

¶ 2    The petitioner, David Harms, filed his petition for dissolution in 2005, long before the amendment went into effect. At that time, the parties had been married for 19 years and 9 months. The 2007 order dissolving their marriage required David to pay maintenance to the respondent, Ruth Parker, formerly known as Ruth Harms. The order provided that maintenance could not be modified until Ruth reached the age of 65, after which time, either party could request review of the original maintenance award. Both parties later filed petitions to modify maintenance. The court found that the amended version of the statute was applicable and that there was no reason to depart from the guidelines for calculating maintenance. The court denied David's petition to terminate or reduce maintenance and granted Ruth's petition to increase maintenance. David appeals, arguing that (1) the court erred by awarding permanent maintenance without finding that there was a reason to depart from the guidelines, which provide that permanent maintenance may only be awarded in marriages lasting at least 20 years, and (2) both the amount and duration of maintenance constituted an abuse of the court's discretion. We affirm.

¶ 3    The parties married in Las Vegas on February 9, 1986. Their son was born in 1987. He was an adult when the dissolution proceedings were initiated. During the parties' marriage, they took out a home equity loan on their marital home. They used the proceeds of that loan to purchase a 20.5-acre parcel of land. David filed a petition for dissolution on November 28, 2005. At that time, as previously noted, the parties had been married for 19 years and 9 months.

¶ 4    In November 2006, Judge Laninya A. Cason presided over the hearing in the dissolution proceedings. At that time, Ruth was 61 years old and was no longer working at a regular full-time job. David would turn 44 the following month and was still working full time.

¶ 5    On January 10, 2007, Judge Cason entered an order dividing the parties' property and ordering David to pay maintenance in the amount of $1300 per month. In pertinent part, the court awarded the marital home to Ruth and assigned the debt remaining on the home equity loan to her. However, the court awarded the 20.5-acre parcel of land purchased with the loan to David. The order provided that the maintenance award was "reviewable when respondent reaches the age of 65 years."

¶ 6    Both parties filed motions to reconsider or clarify this order. Ruth asked the court to reconsider its decision to assign her the debt used to purchase the land that it awarded to David. She also requested that her maiden name be restored. David noted that the January 10 order did not dissolve the marriage. He further noted that the order did not make any findings as to Ruth's income and it did not state when his maintenance obligation was to begin. Finally, he asserted that the order was "ambiguous and/or vague" as to his maintenance obligation, and he requested "clarification of the Court's ruling as it pertains to Respondent when she reaches the age of 65 years."

¶ 7    On April 12, 2007, Judge Cason entered two additional orders. One order dissolved the parties' marriage, effective that date, and restored Ruth's maiden name of Parker. In the other order, Judge Cason attempted to clarify David's maintenance obligation, stating that the award of maintenance was "non-modifiable until Respondent's 65th birthday, July 8, 2011," and that it would be "reviewable" after that time. She denied both parties' motions in all other respects.

3

¶ 8    On August 28, 2007, Judge Cason entered a supplemental dissolution order, which contained findings of fact and provided some of the clarification sought by David in his earlier motion. Judge Cason found that David's net income at that time was $3750 per month, while Ruth's income was $390 per month. She further found that Ruth needed maintenance and David was able to pay maintenance. She ordered David to pay $1300 "in maintenance, commencing on January 15, 2007." The order provided that this maintenance would be nonmodifiable until July 8, 2011, when Ruth would turn 65, and that after that time, maintenance would be "subject to review upon [the] request of either party."

¶ 9    In July 2014, David filed a petition to terminate or reduce his maintenance obligation. In September 2014, Ruth filed a petition to modify maintenance, requesting an increase in maintenance. In June 2016, the matter came for a hearing before Judge Julia Gomric. Both parties testified at the hearing.

¶ 10    David testified that he was 52 years old at that time. He had remarried, and he lived with his wife and their six-year-old daughter in a home they built on the 20.5-acre parcel of land that was awarded to him in the dissolution. David was asked about the economic circumstances of the parties at the time they separated. He testified that he was then earning approximately $48,000 per year and had a retirement account that was valued at $3090. At that time, Ruth worked in a home business the couple owned called Cornfield Industries. David explained that the business sold decals and hitch covers and "that type of stuff." Asked about Ruth's earnings from the business, he testified that he did not "know really what the dollar amounts were" because they put all the proceeds from the business back into the business.

¶ 11    David then testified about his current economic circumstances. He testified that his retirement account was now worth $77,224. His wife, Erika, worked outside the home with an

4

income of approximately $90,000 to $100,000 per year. David initially testified that his own income was approximately $82,000 per year, but he later acknowledged that his 2015 income was $82,786.72, which did not reflect a 2% raise he received in March 2016. David was also asked about Ruth's circumstances at the time of the hearing. He admitted that he did not expect Ruth, who would be 70 years old the following month, to return to work. He acknowledged that her only income was the maintenance he paid and approximately $800 per month in Social Security income. (We note that Ruth's Social Security was $820.90 per month before her $104.90 Medicare premium was deducted, leaving her with an actual payment of $716 per month.) Asked how Ruth would be able to support herself if the court granted his request to terminate her maintenance, David replied, "I don't know."

¶ 12    Ruth testified that the last time she worked at a full-time job outside the home was in 1996 or 1997. She was not working at the time of the parties' dissolution. She testified, however, that she worked at two part-time jobs on a temporary basis subsequent to the dissolution. One of those jobs was a part-time position cleaning trays at an elementary school cafeteria. The other job involved cleaning the offices of a used car dealership owned by her son-in-law. She worked at this job to "fill in" for her son-in-law while he was busy with litigation.

¶ 13    Ruth testified that her only income at the time of the hearing was $1300 per month in maintenance and her Social Security check, which was $716 per month after her Medicare premium was deducted. She began drawing Social Security benefits when she was 62 years old. She acknowledged at the hearing that her Social Security benefits would have been higher had she waited until age 65 to begin drawing them. She estimated that she would have received $400 or $500 more per month had she waited. Asked why she did not wait until she was 65, Ruth

5

explained that she did not have sufficient income to pay all her bills and pay for necessary repairs to her home.

¶ 14    On her financial statement, Ruth stated that she spent $300 per month for home maintenance and repairs. She was asked about this figure by David's attorney at the hearing. She explained that to arrive at this figure, she "took whatever it took to keep the home going, and divided it by 12." However, she could not recall much specific information about the home repairs she had paid for over the previous year. She testified that she had to have her air conditioner rewired and she had to have a plumber repair a broken water line under the house. She thought that the bill for the air conditioner was $300 and the plumbing bill was $250 or $260, but she was not certain of the precise amounts. Ruth testified that there were probably other repairs to the house during the previous 12 months, but those were the only two she could remember offhand. She also testified that she was putting off other necessary home repairs because she could not afford to pay for them, but she offered no specifics.

¶ 15    Ruth testified that she did not have a credit card and that she therefore used cash to pay for most of her necessities—gas, car repairs, groceries, and paper supplies—as well as any entertainment. She stated on her financial statement that she spent $50 per month on entertainment. At the hearing, David's attorney pointed out that records she provided showed cash withdrawals of approximately $700 per month in both April and May 2016. Ruth did not know whether those were typical months or not. She emphasized, however, that those cash withdrawals covered all of her expenses for the month.

¶ 16    David's attorney questioned Ruth at length about one of the expenses she pays for with cash—specifically, playing video gaming machines. Ruth testified that she goes out to play video gaming machines because it is something that gets her out of the house and gives her an

opportunity to be around people. She acknowledged that this activity had become a major part of her social life. She testified, however, that the amount of time she spent on video gaming depended on whether she won. She explained that, if she won, she would use her winnings to continue to play but, if she did not win, she was "done quickly." Ruth testified that she did not know exactly how much she spent on video gaming each month. As noted earlier, Ruth stated on her financial statement that she spent $50 per month on entertainment. At the hearing, she explained that this amount included video gaming, buying newspapers, and any other type of entertainment.

¶ 17    David also offered into evidence a report prepared by a private investigator he hired to attempt to prove that Ruth had an addiction to video gaming. David paid the investigator $5900. The investigator's report describes two different occasions on which he observed Ruth using video gaming machines at a bowling alley. On the first occasion, he observed her for a period of two hours. During that time, he saw her leave the machine she was playing and withdraw cash from an ATM. She then went to the snack bar and had a conversation with someone before returning to play the machine. After two hours, the investigator returned to his vehicle and waited in the parking lot to see when Ruth left. She left 1½ hours later. On the second occasion, the investigator observed Ruth using the gaming machines at the bowling alley for a period of 2½ hours. He saw her put money into the machine four or five times during this period. One time she put $10 into the machine; the other times, she put in $5. On this occasion, he spoke to Ruth, who gave him tips on how to increase his odds of winning. The report also described other occasions on which the investigator attempted to find Ruth using the gaming machines at the bowling alley but did not find her there. The report was admitted into evidence with no objection.

¶ 18     The court took the matter under advisement and entered an order containing detailed findings on July 13, 2016. The court first noted that the statute governing maintenance had been recently amended and indicated that it would apply the amended version of the statute. In setting forth the procedural history of the case, Judge Gomric noted that Judge Cason previously "entered a permanent maintenance order requiring David to pay maintenance to Ruth in the amount of $1300 per month." Judge Gomric also noted that Judge Cason ordered Ruth to assume the debt remaining on the home equity loan but awarded the real estate purchased with the proceeds of that loan to David.

¶ 19     The court then made its findings of fact. The court found that Ruth was 70 years old and retired. Based on her age and the fact that she had not worked in a full-time job since 1997, the court found that Ruth retired in good faith. The court found that "no reasonable efforts at rehabilitation to become self-supporting by Ruth exist" and that there is no reason to believe that she will ever be able to support herself.

¶ 20     The court further found that Ruth's income from sources other than maintenance had increased from $390 per month to $890 per month (as noted previously, it was actually $820.90 per month), while David's income had increased from $48,000 per year to $85,000 per year. The court arrived at this figure by applying the 2% raise David received in 2016 to his 2015 earnings. The court found that Ruth's future earning capacity was impaired by her age and the fact that she was retired. The court found that while David's retirement account had increased in value from $3090 to over $77,000, Ruth had exhausted her retirement account and other savings to pay for home repairs and living expenses.

¶ 21     The court found that both parties' reasonable and necessary monthly expenses totaled $2800 per month. In calculating Ruth's expenses, the court discounted the $300 per month Ruth

8

attributed to home repairs. The court also addressed David's efforts to show that Ruth had a gambling addiction. The court stated:

"Although David, through cross-examination and through the report of Kellermann Investigations, has denigrated Ruth's purported gambling addiction, the Court finds that based upon the limited income available to Ruth, and looking at the reasonable and necessary expenses she has indicated, her purported gambling does not constitute a reason for the court to disbelieve the other expenses she has contained in her financial statement."

¶ 22 The court stated that it was considering several statutory factors, including the reasonable needs of both parties (see 750 ILCS 5/504(a)(2) (West 2016)); the standard of living established during the marriage (see *id.* § 504(a)(7)); the income and property of each party and the debt obligations assigned to each party in the dissolution judgment (see *id.* §§ 504(a)(1), 510(a-5)(6)); the duration of the marriage (see *id.* § 504(a)(8)); the age, health, and employment capability of the parties (see *id.* § 504(a)(3), (5), (9)); and the tax consequences of ordering maintenance (see *id.* § 510(a-5)(4)). The court expressly found that "No facts have been presented to the Court in this matter that support a deviation from the guideline maintenance calculations contained in the statute." The court then determined that the guideline amount for maintenance was $1900 per month. The court did not address the provisions of section 504 governing the duration of maintenance under the new guidelines.

¶ 23 The court ordered David to pay $1900 per month in maintenance, retroactive to January 1, 2015, and to pay Ruth's attorney fees. David filed a posttrial motion, which the court denied. This appeal followed.

9

¶ 24 The propriety, amount, and duration of maintenance are matters within the sound discretion of the trial court. We will not reverse these determinations absent an abuse of the court's discretion. *Johnson*, 2016 IL App (5th) 140479, ¶ 93. However, because statutory construction is a question of law, we will review *de novo* the court's interpretation of the pertinent statutes. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 40.

¶ 25 David first argues that the court erred under the new guidelines in determining that permanent maintenance was appropriate. He correctly notes that the length of the marriage is determined by using the date the petition for dissolution is filed, not the date the dissolution becomes final. See 750 ILCS 5/504(b-1)(1)(B) (West 2016). He also correctly notes that under the new guidelines, permanent maintenance is only awarded in marriages of 20 years or longer. See *id.* Instead, as he points out, the guidelines provide that the duration of maintenance awarded after a marriage of at least 19 but less than 20 years is calculated by multiplying the length of the marriage by 0.80. See *id.* David acknowledges that the court has the discretion to depart from the guidelines with respect to the amount or duration of maintenance. However, he argues that the court must set forth its reasons for doing so. See *id.* § 504(b-2)(2). Here, not only did the court *not* set forth reasons to depart from the guideline for determining the duration of maintenance, it explicitly stated that it found no reason to depart from the guidelines. Thus, David contends, the court either misapplied the new guidelines or erroneously determined that the parties' marriage was a 20-year marriage.

¶ 26 In response, Ruth argues that trial courts have discretion to depart from the statutory guidelines. See *id.* § 504(b-1). She further argues that, under the facts of this case, the court would have abused its discretion if it had not ordered permanent maintenance.

¶ 27 We agree with David that the court misconstrued the new statutory guidelines. The statute includes guideline formulas for determining *both* the amount and duration of maintenance. See *id.* § 504(b-1)(1). The statute further provides that if a court orders maintenance that is *not* in accordance with these guidelines, the court "shall" make findings as to the amount or duration of maintenance that would have been ordered under the guidelines as well as its reasons for not using the guideline amount or duration. *Id.* § 504(b-2)(2). Thus, courts are required to make these findings if they depart from *either* aspect of the new guidelines. Here, the court found that there was no reason to depart from the guidelines, but it did not follow the guidelines with respect to the duration of maintenance and did not make the required findings.

¶ 28 More importantly, however, we believe the court erred in finding the guidelines to be applicable under these circumstances at all. We reach this conclusion after consideration of the language of two pertinent statutes—section 504 of the Dissolution Act, which governs initial awards of maintenance, and section 510, which governs petitions to modify maintenance or child support. See *id.* §§ 504, 510.

¶ 29 The primary rule in statutory construction is that we must ascertain and effectuate the intent of the legislature. *In re Marriage of Lubbs*, 313 Ill. App. 3d 968, 969-70 (2000). The best indicator of legislative intent is the plain language of the statutes themselves. *Id.* at 970. Where, as here, multiple statutes relate to the same subject, we must presume that the legislature intended those statutes to be "consistent and harmonious." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 60 (2006). We must also presume that the legislature "did not intend absurdity, inconvenience or injustice." *Id.*

¶ 30 The guidelines are found in section 504. By its express terms, the statute applies only in proceedings "for dissolution of marriage or legal separation," proceedings for a "declaration of

11

invalidity of marriage," or in proceedings where one party seeks an award of maintenance "following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse." 750 ILCS 5/504(a) (West 2016). These are all proceedings involving *initial* maintenance orders. Section 504 is relevant in proceedings on petitions to modify maintenance only because it is referenced in section 510, which, as we noted, governs petitions to modify. See *id.* § 510. That statute provides that, in ruling on a petition to modify maintenance, courts must consider "the applicable factors set forth in *subsection (a) of Section 504*" as well as several additional factors listed in subsection (a-5) of section 510. (Emphasis added.) *Id.* § 510(a-5). Section 510 does *not* refer to subsection (b-1) of section 504, which contains the new guidelines. See *id.*

¶ 31    It is worth noting that section 510 has been amended four times since the guidelines went into effect. See Pub. Act 99-90, § 5-15 (eff. Jan. 1, 2016); Pub. Act 99-764, § 5 (eff. July 1, 2017); Pub. Act 100-15, § 5 (eff. July 1, 2017); Pub. Act 100-201, § 705 (eff. Aug. 18, 2017). None of these amendments added language directing courts to apply the guidelines in proceedings to modify maintenance. Had the legislature intended to make the guidelines applicable in proceedings to modify maintenance, it easily could have added language to section 510 to achieve this result. Thus, under the express terms of the two statutes, the guidelines are not applicable in such proceedings.

¶ 32    Although we need not look beyond the express statutory language, we find further support for our interpretation from the fact that applying the guideline formula for duration to a preexisting maintenance award will often lead to results that are absurd or unjust. This case provides a perfect illustration.

¶ 33    The instant case involves an award of indefinite or permanent maintenance. Although we note that none of Judge Cason's orders expressly labeled the maintenance as either "permanent" or "rehabilitative," as we mentioned earlier, Judge Gomric characterized the original award of maintenance as "permanent maintenance," and we agree with this characterization.

¶ 34    If an award of maintenance "bears all the hallmarks of traditional permanent maintenance," it will be deemed to be permanent regardless of whether it is labeled as such. *In re Marriage of Bolte*, 2012 IL App (3d) 110791, ¶ 21. The purpose of rehabilitative maintenance is to provide the recipient spouse an incentive to develop the job qualifications necessary to become self-sufficient after a period of time. *In re Marriage of Carpenter*, 286 Ill. App. 3d 969, 972 (1997). Thus, awards of rehabilitative maintenance generally require maintenance to be paid for a specified period of time, "thereby presumably allowing the recipient to become 'rehabilitated' and able to support herself." *Bolte*, 2012 IL App (3d) 110791, ¶ 24.

¶ 35    Here, the 2007 orders did not provide that maintenance would automatically terminate after a fixed period of time. The orders also did not provide that, after a fixed period of time, Ruth would have to demonstrate that she had made reasonable efforts to become self-sufficient, although they did provide that the maintenance could be reviewed after Ruth turned 65 at the request of either party—presumably to allow the court to reassess the financial positions of the parties once Ruth began collecting Social Security. See *id.* The 2007 dissolution orders thus gave Ruth a right to receive permanent maintenance. It would be unjust and absurd to alter this right years later because of a statutory amendment. As stated previously, we must presume that the legislature did not intend such a result. See *DeLuna*, 223 Ill. 2d at 60. We therefore hold that the guidelines are not applicable in proceedings to modify preexisting maintenance orders. The court erred in reaching the opposite conclusion.

13

¶ 36    Although we have concluded that the court's interpretation of the relevant statutory provisions was not correct, we do not believe the court's use of the new guidelines to calculate the amount of maintenance necessarily requires reversal. This court has previously recognized that even where the guidelines are not applicable, an award of maintenance that is consistent with the guideline amount will typically be a proper exercise of the court's discretion. See *Johnson*, 2016 IL App (5th) 140479, ¶¶ 108, 110 (recognizing that the new guidelines were not applicable but finding additional support for its conclusion that the amount of maintenance awarded was an abuse of discretion because there was a significant disparity between the amount awarded and the amount that would have been awarded under the guidelines). Here, the court expressly stated that it considered the relevant factors in both section 504 and section 510 (750 ILCS 5/504(a), 510(a-5) (West 2016)), as it was required to do. After consideration of these factors, the court determined that guideline amount of maintenance was appropriate. We may affirm the court's ruling on any basis appearing in the record, even if it was not the basis relied upon by the court. *In re Marriage of Fortner*, 2016 IL App (5th) 150246, ¶ 15. Thus, as long as the court considers the required factors and does not abuse its discretion in determining the amount or duration of maintenance, we may affirm its ruling.

¶ 37    This brings us to David's next argument. He argues that the court abused its discretion both by increasing his maintenance obligation and by making maintenance permanent. He argues that the court overlooked various factors, including an increase in Ruth's income and the lack of any evidence that Ruth had attempted to become self-sufficient. He complains that Ruth "overstated" the amount of money she spent for home maintenance and repairs. Finally, he emphasizes the evidence he presented to attempt to show that Ruth had a gambling addiction and

14

the evidence that she had not paid off the home equity loan assigned to her. We are not persuaded.

¶ 38     Contrary to David's assertion, the court did in fact consider the factors he claims it overlooked. The court expressly found that Ruth's income had increased when she began receiving Social Security benefits, and the court took that amount of income into consideration when determining the amount of maintenance to award. The court also expressly found that there was no reason to believe that Ruth, a 70-year-old retiree, had any realistic avenue to become self-sufficient. This finding was amply supported by the record, and David acknowledged as much in his testimony when he admitted he did not expect Ruth to go back to work and that he had no idea how she would support herself if maintenance were terminated.

¶ 39     We find David's argument that Ruth "overstated" her expenses for home maintenance and repair particularly unavailing. If anything, it appears that she likely underestimated these expenses. She testified at the hearing that she was required to pay for two major repairs to her home during the 12 months before the hearing—one was a repair to a broken pipe underneath the house, and the other was a rewiring of her air conditioner. She could not remember precisely how much she paid for either repair, and she could not remember what other repairs were needed. It is likely that it cost more than $260 to repair a pipe under the house. However, it was Ruth's burden to establish these expenses, and the court discounted the $300 per month Ruth claimed she spent on home maintenance and repair when it found that her reasonable monthly expenses were $2800 per month.

¶ 40     The court also addressed David's evidence that Ruth spent time playing video gaming machines. The court referred to this evidence as evidence of a "purported gambling addiction," implying that the court did not find the evidence particularly persuasive, but the court did not

make any express credibility determinations. The court did, however, find that $2800 of the expenses listed by Ruth in her financial statement were reasonable, a determination that was supported by the evidence. Thus, even assuming Ruth understated the amount of money she spent on video gaming, as David asserts, the court's maintenance award was properly based on its finding that her *other* expenses were reasonable.

¶ 41    It is also worth noting that the investigator's report only revealed that Ruth spent a few hours playing video gaming machines on two different occasions and that on one of those occasions, she spent approximately $30. Although the precise nature and extent of the surveillance leading to these two observations is not clear, it appears that the investigator spent a significant amount of time following Ruth attempting to find evidence of a gambling addiction. His reports indicated that on at least three other occasions, he went to the parking lots of two different bowling alleys looking for Ruth's car and that on one other occasion, she noticed him following her car and took evasive action. During the hearing, Ruth's attorney attempted to ask Ruth if she wanted the court to order David's private investigator and members of David's family to stop following her, but the court noted that she did not request this relief in any pleadings. We find nothing in this evidence that renders the court's decision an abuse of discretion.

¶ 42    Finally, David complains that Ruth was "completely derelict in her duty" to pay the home equity loan that was assigned to her in the dissolution. As we have discussed, the loan was taken out by David and Ruth during their marriage and used to purchase a piece of land that was awarded to David in the dissolution, free and clear of any claim by Ruth. David acknowledged at the hearing that Ruth made the required payments under the loan. He complained, however, that she took an additional loan without his consent, thereby adding to the debt, and that she did not

16

refinance the loan to remove his name from it. Although David claims that the continued existence of the loan has impacted his own ability to borrow money, he has not provided any explanation or examples. Ruth testified that the bank would not allow her to refinance the loan to remove David's name. She acknowledged that she added to the debt. She explained that she borrowed additional money on the line of credit because she needed that money to make the monthly payments.

¶ 43    We are not convinced by David's argument that this additional loan required the court to terminate or reduce Ruth's maintenance. A former spouse receiving maintenance is not required to exhaust all of her assets in order to meet her basic needs. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 304 (2010). By the time of the hearing in this matter, Ruth had already exhausted her retirement account and other savings in order to provide for her basic needs and to pay the debt assigned to her. The court did not abuse its discretion by increasing the amount of her maintenance under these circumstances, and the evidence that she felt compelled to take on additional debt in order to pay a loan used to purchase property now owned and enjoyed by David does not alter this conclusion.

¶ 44    As stated previously, an award of maintenance consistent with the guideline amount will ordinarily not be found to be an abuse of the court's discretion even in cases where the guidelines are not applicable. The maintenance awarded in this case represents an increase of $600 per month. This is hardly excessive in light of the fact that David's income nearly doubled in the years since the dissolution. As Ruth points out, the maintenance award still leaves her with slightly less than she needs to meet the $2800 per month in expenses the court found reasonable. We find no abuse of discretion in the amount of maintenance ordered by the court.

¶ 45    We likewise find no abuse of discretion in the court's decision to award permanent maintenance. As previously discussed, the original 2007 maintenance order was, in substance, an award of permanent maintenance despite the lack of clarity in Judge Cason's order. Moreover, regardless of how the original order is characterized, we agree with Ruth that the court would have abused its discretion had it not awarded permanent maintenance. Rehabilitative maintenance is only appropriate if the recipient spouse is employable at an income level sufficient to allow her to live at the standard of living established during the marriage. *Nord*, 402 Ill. App. 3d at 305. Permanent maintenance is appropriate in cases where the recipient spouse is not employable at that level or not employable at all. *Johnson*, 2016 IL App (5th) 140479, ¶ 93. In such cases, an award of rehabilitative maintenance is an abuse of discretion. *Carpenter*, 286 Ill. App. 3d at 973. At the time of the hearing in this matter, Ruth was about to turn 70 and had long ago retired. David admitted that he did not expect her to return to work. Under these circumstances, the court would have abused its discretion if it had awarded anything other than permanent maintenance.

¶ 46    We find no abuse of discretion in either the amount or duration of maintenance, and we find that the court considered the factors it was required to consider. We therefore affirm the court's order increasing David's maintenance obligation to $1900 per month and denying David's petition to terminate maintenance.

¶ 47    Affirmed.

2018 IL App (5th) 160472

NO. 5-16-0472

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| DAVID R. HARMS, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 05-D-1038 |
| | ) | |
| RUTH PARKER, f/k/a Ruth Harms, | ) | Honorable |
| | ) | Julia R. Gomric, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

**Opinion Filed:**     **May 3, 2018**
_____

**Justices:**     Honorable Melissa A. Chapman, J.

Honorable Judy L. Cates, J., and
Honorable David K. Overstreet, J.,
Concur
_____

**Attorneys**     Anthony R. Garavalia, Brian D. Flynn, Flynn, Guymon & Garavalia,
**for**          300 West Main Street, Suite 4, Belleville, IL 62220
**Appellant**
_____

**Attorneys**     Charles W. Courtney, Jr., Jayni A. Desai, Alana I. Mejias, Courtney,
**for**          Clark & Mejias, P.C., 104 S. Charles Street, Belleville, IL 62220
**Appellee**
_____