NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190416-U

NO. 4-19-0416

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 11, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| J. ANTONIO G. LOPEZ, | ) | Circuit Court of |
|     Petitioner-Appellant, | ) | Sangamon County |
|     and | ) | No. 96D567 |
| ELENA ORTIZ, | ) | |
|     Respondent-Appellee. | ) | Honorable |
| | ) | Matthew Maurer, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not abuse its discretion by denying former husband's motion to terminate maintenance.

¶ 2   Petitioner, J. Antonio G. Lopez, appeals the trial court's denial of his motion to terminate his maintenance obligation to respondent, Elena Ortiz. We affirm.

¶ 3                                I. BACKGROUND

¶ 4   The parties were married in June 1986 and had two children, Andres (born in 1991) and Marco (born in 1992). In June 1996, Antonio filed a petition for dissolution of marriage. In September 1998, the trial court entered a judgment dissolving the marriage, which incorporated the parties' marital settlement agreement. At the time of dissolution, Antonio was 42 years old and working as a cardiologist in Springfield, Illinois. Elena was 39 years old and "a full-time

homemaker." The parties' marital settlement agreement reflects that Marco, the parties' youngest child, had "been diagnosed as severely autistic" and had "special needs for education and medical treatment due to his autism." The parties "anticipated that given [Marco's] disability *** and the amount of time and attention required of Elena as a result of such disability, Elena [would] be unable to obtain employment during [Marco's] minority ***."

¶ 5       Under the marital settlement agreement, Antonio agreed to assume the marital debts, totaling in excess of $156,000. He also agreed to pay Elena $94,720 to facilitate a move by Elena and the minor children to California, where the parties believed Marco's special educational and medical needs could be better met. The parties' next agreed that Antonio would pay Elena maintenance of $4500 per month for one year. Maintenance would then increase to $5000 per month for another year, after which it would be reviewable. With respect to the children, the parties agreed to joint legal custody. However, Elena would be the primary caretaker of the children and they would reside with her on a daily basis. Antonio agreed to pay Elena child support of $3562 per month.

¶ 6       Following the divorce, both parties eventually relocated to California. In January 2006, the trial court transferred the case to San Diego County, California. In October 2006, a California court ordered that Illinois law was to be utilized in deciding the issue of maintenance, and in November 2007, it entered an order continuing Antonio's $5000 per month maintenance obligation and establishing a maintenance arrearage. In June 2017, Elena asked the California court to increase spousal support. Antonio responded by seeking termination of his maintenance obligation. In February 2018, the California court transferred venue of the case back to Illinois to address the maintenance issue.

¶ 7          In March 2018, Antonio filed a motion to terminate maintenance with the Sangamon County, Illinois, circuit court. He asserted that, since the parties' divorce, there had been a substantial change in circumstances such that maintenance should be terminated. He pointed out that the parties' children were adults, he had been ordered to continue providing support for Marco, and that he and Elena had been divorced for almost 20 years. Antonio also asserted that although Elena was capable of being employed, she made no efforts to obtain employment since the marriage was dissolved. Additionally, he asserted that he was 62 years old and suffered from "multiple medical conditions that could limit his ability to continue working for an extended period of time."

¶ 8          In May 2019, the trial court conducted a hearing in the matter, during which both parties testified. Elena, then age 60, stated she continued to reside with the parties' youngest child, Marco, who was then 26 years old and "severely autistic." She had been Marco's caregiver for his entire life and described him as nonverbal and child-like. Marco had behavioral issues and could not be left alone. Elena testified the parties' oldest child, Andres, lived independently.

¶ 9          Regarding her education and work history, Elena testified that she had an associate's degree in fashion merchandising. Prior to 1990, she did "some home decorating for friends." She also previously worked in the retail field and in the banking field as a bank teller and an assistant bank manager. Elena had not been employed outside the home since before Andres's birth in 1991, and had not sought employment since the parties' divorce in 1998. She stated that Marco was her "full-time responsibility" and caring for him "takes up a lot of [her] time." Elena acknowledged that, since 2014 or 2015, she was paid $12.50 an hour for being Marco's caretaker through a government program in California. In 2018, she received $46,470 through that program, and in 2019, she expected to make $49,944.

¶ 10         Additionally, in 2018, a California court increased Antonio's child support obliga-

tion, requiring him to pay $3674 per month. Elena testified that Antonio continued to pay her

maintenance totaling $60,000 per year, *i.e.*, $5000 per month. Only her maintenance income was

taxable. The income she received through the California caretaking program and for child support

was tax free.

¶ 11         Elena's most recent financial affidavit in the case, dated May 22, 2019, showed

total monthly living expenses of $9866. She also reported monthly debt payments of $2795.47 and

that her monthly expenses and debts exceeded her monthly income by $387.17 per month. At the

hearing, she acknowledged her reported debts included Andres's student loan debt and agreed that

she did not cosign for his loans. Nevertheless, she reported owing $52,160 toward Andres's student

loans and making monthly payments of $1083. Elena's other reported debts included money owed

for state and federal taxes ($4542), a loan for attorney's fees ($9400), credit card debt ($247), and

money owed for funeral and burial insurance ($6600). She listed several other debts, totaling over

$4000 that were reportedly "in collection." However, she acknowledged that the balances for those

debts should be reduced as the balances she listed were from September 2018 and she had been

making payments since that time. Elena also acknowledged that the funeral and burial insurance

she listed was purchased for herself and Marco in April 2018, the month after Antonio filed his

motion to terminate maintenance. Elena testified she paid $600 per month for that insurance.

¶ 12         Elena's assets included her vehicle with a fair market value of $2000, life insurance

policies for herself and Marco, a checking account in her name with a balance of $200, and a joint

checking account with Andres with a balance of $2500. She acknowledged that the money she

received from the State of California for caring for Marco was deposited into the joint account she

had with Andres. She agreed that money in that account was primarily used by Andres "to pay for his student loans and to live." Andres had attended film school but was no longer in school and was working. Elena testified Andres was an associate producer and editor for a show in Burbank, California. He also deposited the money he earned from his job into the joint account. Elena explained that she was helping Andres pay for some of his college loans and, to her knowledge, Antonio had not contributed anything toward Andres's college expenses. On questioning by the trial court, Elena explained that the reason she deposited her income from caring for Marco into the joint account was "to make sure that [Andres's] student loans don't go into default."

¶ 13    Elena further testified that she used money in the joint account for emergency expenses or if she needed to pay a bill and had not yet received a "check" for maintenance and child support. She stated that if she withdrew money from the joint account, she would "try to put it back in so that it's just there *** in case we do need it." On examination by Antonio's counsel, Elena agreed that from December 2017 to March 2019, she made transfers from her personal bank account to the joint account in the amount of $17,878. She also acknowledged making cash deposits totaling $11,456.92 during that same time frame.

¶ 14    Elena testified that money she received for maintenance and child support was deposited into her personal account. She utilized that account to pay living expenses for herself and Marco. She agreed that for a period of about six months she helped Andres by making his car payments using funds from her personal account.

¶ 15    Elena also described her care of Marco. She testified that, as a minor, Marco attended school five days a week from approximately 8 a.m. to 3 p.m. At age 20, he completed his high school program and began attending a day program at Stein Education Center (Stein). The

day program was also five days a week with hours from 9 a.m. to 2 p.m. After two years at Stein, the program ended and Marco began staying at home with Elena. Elena explained that she "couldn't find the right program for [Marco]" and he remained at home for two years. He then began a day program called People's Choice Bliss (Bliss), which was five days a week from the hours of 8 a.m. to 2 p.m. Marco was in the Bliss day program for approximately one year until the program ended in November 2018.

¶ 16        After the Bliss program ended, Elena investigated another day program for Marco called the TERI program. Marco was on a waiting list but had not yet been approved for the program. Elena agreed that Marco's caseworker, who assisted her with "getting Marco care" believed that Marco "needs to be in a day program." Elena testified that since November 2018, she had "been trying every single day" to find a new program for Marco. She estimated that she had investigated or called 10 to 15 different programs since that time. Elena testified that there were different levels of programs based upon the needs of each individual. She believed Marco's behavioral issues were severe and that he needed "one-on-one" care for his safety.

¶ 17        Elena testified that, at the time of the parties' divorce, both she and Antonio anticipated that she would be unable to obtain employment during Marco's minority due to his disability. She stated that, since the divorce, Marco's condition had only become worse because Marco was bigger and, as a result, more dangerous when he lashed out. Elena described Marco as being six feet, two inches tall and weighing 250 pounds. Elena asserted that she "would love to work" and "have a normal life"; however, an employer would need to understand that she "might have to leave in a moment" to care for Marco. When Marco was in school or a day program, he sometimes had a behavioral issue that required her to "stay with him for a little while until he calmed down."

Also, Marco was not always able to stay in school or in a program for the entire day "[b]ecause he had behavioral issues or other people would have meltdowns and it would have a domino effect." Elena estimated that there were "[s]everal times" each month that she had to pick Marco up early from school or a day program. Elena did not believe she would be able to obtain full-time employment even once she found a day program for Marco, stating the programs typically were not long enough to accommodate full-time employment.

¶ 18 Antonio testified that he was 63 years old and resided in California with his wife, Laura, who did not work outside the home. At the time his marriage to Elena was dissolved in 1998, Antonio worked for Prairie Cardiovascular Consultants in Springfield, Illinois. He stated he was the director of preventative cardiology, the lipid clinic, and cardiovascular rehabilitation. Also, he was a full partner, earning approximately $400,000 a year.

¶ 19 In 2002, Antonio relocated to California to be closer to his children. He began working for Desert Cardiology Consultants, earning approximately $250,000 a year. Antonio testified he worked for Desert Cardiology Consultants for about a year and a half and then on two or three occasions relocated to different cities in California. During his relocations he worked for different employers and continued to earn approximately $250,000 a year. He testified that between 2002 and 2007, he was able to consistently make his maintenance and child support payments.

¶ 20 In 2007, Antonio moved to Boise, Idaho, and fell behind in his support payments. Elena filed a petition in a California court "seeking compliance with the support payments." Following a hearing on the petition, Antonio was ordered to "catch up" on his payments. Antonio testified he earned between $250,000 to $300,000 a year while in Idaho. Also, to get caught up on

his arrearage, he began giving presentations and worked as a consultant for pharmaceutical companies. He earned $80,000 to $100,000 through "speaking and consulting." Antonio testified he remained in Idaho until 2014, when he returned to California. In October 2014, Antonio began working for Amgen, a biopharmaceutical company. He continued to work for Amgen at the time of the hearing, stating he was a clinical research medical director in Amgen's global development department.

¶ 21          Antonio explained that, in Idaho, he worked as a cardiologist in a hospital setting and "developed a low back discomfort and lumbar disease" along with left leg weakness. As a result, his "ability to do procedures, emergency heart procedures regularly was confounded." He decided "to continue [his] career doing research" so that he was not required "to be on hospital duty."

¶ 22          Antonio testified that in 2014, his initial salary with Amgen was $274,000 a year. At the hearing, he submitted a financial affidavit (page three of which is missing from the appellate record) in which he reported gross income while working for Amgen in 2018 of $420,224.28. He submitted an amended tax return for the same year, reporting "[t]otal income" for 2018 of $458,696 and an adjusted gross income (after his maintenance payments to Elena were subtracted) of $397,378. Similarly, his federal tax return from 2017 showed he reported total income of $450,418 with an adjusted gross income of $384,683. In 2016, he reported total income of $402,769 with an adjusted gross income of $342,769.

¶ 23          Antonio testified that in 2019, he was earning gross monthly pay from Amgen of $24,253.99. He stated he had 26 pay periods each year and received $11,194.15 each pay period. Antonio used those figures to calculate his gross monthly income. In addition to his regular pay,

he also received a bonus from Amgen in March of every year. In March 2019, Antonio's bonus was $94,330.46. Finally, Antonio also received a yearly "grant" of "restricted stock" from Amgen that was deposited into his retirement savings account. In 2019, the "grant" totaled $35,924.57.

¶ 24        Antonio acknowledged that the $24,253.99 figure he reported as his gross monthly income did not include either his yearly bonus or the "restricted stock." Further, he agreed that he did not include his bonus as income on his financial affidavit. Antonio testified that his bonus was approximately $80,000 in 2018 and approximately $130,000 in 2017.

¶ 25        On his financial affidavit, Antonio reported deductions from his gross monthly income totaling $14,226.96, resulting in a monthly net income of $10,027.03. Antonio submitted a pay stub from Amgen for a pay period ending March 17, 2019, representing one of his 26 pay periods. It showed "Gross Pay" of $11,194.15, deductions that totaled $7950.97, and a "Net Pay" of $3243.18. The pay stub also showed "year to date" pay of $216,456.

¶ 26        Antonio's financial affidavit did not contain an itemized list of his reported deductions. However, his testimony and pay stub showed that deductions from his gross pay included $2595.66 for state and federal taxes and Medicare; $3951.69 for "Famsup," which Antonio testified represented amounts deducted from his pay for maintenance and child support; $237.53 for dental, medical, and vision insurance, which Antonio testified was for himself, his wife, and Marco; and $1119.42 for Antonio's contribution to his 401K. Antonio testified his monthly deductions for dental, medical, and vision insurance totaled $514.64 and that his 401K contributions were voluntary and totaled $2425.41 a month. Additionally, Antonio testified deductions were also taken from his gross pay for "some voluntary life insurance, and some accidental death and dismemberment" insurance.

¶ 27      On his financial affidavit, Antonio next asserted that he had monthly living expenses of $18,942.15. That figure included $9003.40 for monthly household expenses, $2691.84 for monthly transportation expenses, $3572.91 for monthly personal expenses, and $3674 for his monthly child support obligation. Antonio acknowledged that his transportation expenses included payments for his wife's vehicle, a Porsche, that was over $1600 a month. He further acknowledged that his monthly personal expenses included $1398 for attorney fees. Antonio testified that figure represented an average of the attorney fees he paid in the last year in connection with both the maintenance case and real estate issues for which he required the assistance of an attorney. It also included amounts he was ordered to pay Elena's California attorney.

¶ 28      On his financial affidavit, Antonio listed assets, including savings and checking accounts with balances totaling $47,404.37; a college savings plan for his wife with a balance of $11,432.46; his wife's 2015 Porsche with a fair market value of $43,859 and a loan balance of $50,142.14; and various retirement accounts with values or balances totaling $336,212.49. Antonio further listed his current residence, which he asserted had a fair market value of $1,250,000 and a mortgage balance of $1,124,847.52;

¶ 29      Antonio asserted that since 2014, he had been unable to consistently make his support payments and support his household without borrowing money from his retirement accounts or obtaining bank loans. He testified that in 2015, he borrowed $300,000 from his 401K. In 2017, he obtained a home equity loan from Wells Fargo for approximately $75,000. On two occasions, one in 2017 and one in 2018, he borrowed $21,000 from a retirement account. Finally, in 2019, he borrowed $34,000 from a retirement account and took out a line of credit at KeyBank. Antonio testified he owed KeyBank approximately $37,749 and made payments of $1200 a month in

connection with that debt. According to Antonio, he was "in the negative" by a little over $10,000 each month. He "close[d] the gap each month on that $10,000" by borrowing from his retirement and taking out lines of credit.

¶ 30 Regarding his health, Antonio noted that he suffered a heart attack in July 2018. He testified as follows:

> "Well, I developed a mild amount of injury to the bottom of my heart. And my—I had a total obstruction in my right coronary artery needing two stints, it was an emergency procedure. They also found at that time I had 90/95 [%] obstruction on my left anterior descending coronary artery requiring stints. So[,] I have three stints in my heart."

Antonio stated he remained employed after his heart attack and did not lose any income. Currently, he was fully rehabilitated from his heart incident and working at "[f]ull capacity."

¶ 31 On cross-examination by Elena's counsel, Antonio testified he had not seen Marco since approximately 2010 and was not aware of the extent of his disabilities. He also had not had any contact with Marco's caseworker, was not aware of Marco's daily needs, and had no knowledge of the care Elena provided to Marco. Antonio further acknowledged that in the marital settlement agreement, the parties agreed that, due to Marco's disability, Elena would not be able to obtain employment while Marco was a minor.

¶ 32 Finally, Elena submitted into evidence the March 2019 deposition of Jeffrey Nelson, a service coordinator with the San Diego Regional Center (Center) in California. Nelson testified the Center provided services to clients to "enable them to become more independent." Marco was eligible for services from the Center due to his autism and had been "on [Nelson's] caseload"

- 11 -

for almost 4½ years. Nelson stated that Marco had received " 'in-home respite care services' " and behavioral counseling from the Center.

¶ 33        Nelson described Marco as being "a rather large young man," who was "essentially nonverbal" and "known to be aggressive[,] particularly with his mom[.]" He testified Marco was not able to care for himself on a daily basis and needed to be supervised "around the clock 24/7 to ensure his safety and security."

¶ 34        Nelson stated that Marco had been in a community-based day program, but the program "closed for business." Since then, the objective was to get Marco into "an enhanced be-havioral *** management or behavioral modification day program." Nelson testified that such a program would more specifically address clients with aggressive or inappropriate behaviors. He stated that Elena had requested that Marco attend a TERI program, which was an enhanced com-munity-based day program. However, there were certain procedures that the Center had to com-plete due to the intensity and costliness of the program. Nelson stated as follows:

> "And so essentially [Elena] has been informed by us that she would need to
> try to get Marco into some programs that are behavioral modification day programs,
> but are somewhat less intensive first, and if he's unable to get in there either because
> of a waiting list or because of other issues, then, you know, we would need that
> documentation so that we can present that to one of our committees to determine
> whether or not Marco could be accepted into [the TERI] program."

When Nelson last spoke with Elena, she stated there were two programs that she was looking into to determine whether they could meet Marco's needs or whether they would accept him. He noted that many programs "have six-month waiting lists or longer." Nelson stated he believed it was

"very important for someone like Marco to be in a behavioral day program."

¶ 35    Nelson testified that, to his knowledge, Marco had never been "kicked out" of a day program. Many times, however, Elena reported that Marco was not cooperative with going to his program and there were times that he would refuse to leave Elena's vehicle when she would attempt to drop him off.

¶ 36    Nelson testified that, currently, Marco resided with Elena, who had been providing his care, assisting Marco with meal preparation, "toileting," personal hygiene, and independent living tasks. He stated that if Marco was not living with Elena he would likely "have to be in some sort of group home." According to Nelson, he and Elena had discussed that possibility. Nelson also testified that there were "levels" of group homes ranging from one to four. He testified that higher levels corresponded to clients with aggressive behaviors, inappropriate behaviors, or medical issues. An assessment would need to be performed to adequately determine the level of care Marco required; however, Nelson estimated that Marco "would be at least a level [three] because of his behaviors." He stated that costs associated with a group home were paid for by family or through social security benefits.

¶ 37    At the conclusion of the hearing, the parties agreed to submit written closing arguments and the trial court took the matter under advisement. In June 2019, following the parties' submission of their written arguments, the court entered an order denying Antonio's motion. Although it found that there had been a substantial change in the parties' circumstances, it concluded that termination or modification of maintenance was not warranted based on the "testimony, evidence, statutory factors[,] and credibility of the witnesses."

¶ 38    This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40        On appeal, Antonio argues the trial court erred by denying his motion to terminate maintenance. He maintains termination of his maintenance obligation was warranted based on several factors, including (1) Elena earning income as Marco's caretaker; (2) a $10,000 decrease in his income from the time of dissolution; (3) Elena's failure to make an effort to obtain employment outside the home, either when the parties' children were minors or after they became adults; (4) his payment of maintenance "for almost double" the length of the marriage; (5) Elena's exaggeration of her monthly expenses; (6) the property distribution and debt allocation at the time of dissolution; and (7) Elena's financial support of Andres.

¶ 41        Under the Illinois Marriage and Dissolution of Marriage Act (Act), "[a]n order for maintenance may be modified or terminated only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2018). "A 'substantial change in circumstances' as required under [the Act] means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance has changed." *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 132, 35 N.E.3d 1178. The party seeking modification or termination has the burden of establishing such a change. *Id.*

¶ 42        Section 510(a-5) of the Act sets forth several factors that the trial court must consider when deciding whether to modify or terminate maintenance, including:

            "(1) any change in the employment status of either party and whether the change has been made in good faith;

            (2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

- 14 -

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage *** and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage ***; and

(9) any other factor that the court expressly finds to be just and equitable."

750 ILCS 5/510(a-5)(West 2018).

Section 510(a-5) also requires that the court consider the factors relevant to a determination of an initial maintenance award set forth in section 504(a) of the Act. *Id.* §§ 504(a), 510(a-5). Those factors include the parties' income, property, and needs; the parties' realistic future earning capacities and any impairments to those earning capacities; the time necessary for the party seeking maintenance to acquire appropriate education, training, and employment; whether the party seeking maintenance is able to support himself or herself through appropriate employment; the effect of parental responsibility arrangements on the party seeking employment; the standard of living during the marriage; the duration of the marriage; each party's age, health, station, occupation,

- 15 -

amount and source of income, vocational skills, employability, estate, and liabilities; tax consequences to each party; contributions and services by the party seeking maintenance to the education, training, or career of the other party; any valid agreement of the parties; and any other factor that the trial court finds just and equitable. *Id.* § 504(a).

¶ 43 "The standard of review of a support order is whether it is an abuse of discretion, or whether the factual predicate for the decision is against the manifest weight of the evidence." *In re Marriage of Bates*, 212 Ill. 2d 489, 523, 819 N.E.2d 714, 733 (2004). "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24, 89 N.E.3d 296. Additionally, "[f]indings are against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotation marks omitted.) *In re Marriage of Nord*, 402 Ill. App. 3d 288, 294, 932 N.E.2d 543, 549 (2010).

¶ 44 Here, the trial court determined that although there had been a substantial change in the parties' circumstances, the evidence presented did not warrant modification or termination of Antonio's maintenance obligation. The court did not explicitly identify the circumstances that it found had substantially changed for the parties and neither party challenges that portion of the court's decision. Instead, as indicated, Antonio argues that the relevant statutory factors for consideration weighed in favor of no maintenance rather than allowing it to continue. He asserts that no reasonable person would take the view adopted by the trial court and, accordingly, the court abused its discretion. We disagree and find the record supports the court's judgment.

¶ 45    At the time of the hearing, Antonio was 63 years old. When the parties divorced, he was working as a cardiologist and, per his testimony, earning an income of approximately $400,000 per year. Although his employment changed over the years and his income decreased for a period, at the time of the hearing on his motion to terminate, he was working in the medical research field and earning a substantial income. In 2018, he reported gross income of $420,224.28. His tax returns for that year reflect total income of $458,696 and an adjusted gross income—*after* the subtraction of his maintenance payments to Elena—of $397,378.

¶ 46    Both before the trial court and on appeal, Antonio asserts that in 2018, his "income was $397,378" and that his "income has decreased by approximately [$10,000] per year." This contention is not supported by the record. As stated, the $397,378 figure represents Antonio's 2018 adjusted gross income, *i.e.*, income minus his maintenance payments. It appears from the evidence presented that he actually earned more in 2018—the last full year for which information regarding his yearly income was available—than he reported earning in any previous year.

¶ 47    With respect to Elena, the evidence does support Antonio's assertion of increased income. Elena was 60 years old at the time of the hearing on the motion to terminate maintenance and had not worked outside of the home since prior to the birth of the parties' first child in 1991. However, in 2014 or 2015, she began receiving money through a California program for acting as Marco's caretaker. She was paid $12.50 an hour and earned $46,470 from the program in 2018. In 2019, she expected to earn $49,944. In addition to money she received from the California program, Elena's only other income was from child support she received for Marco and maintenance. Evidence showed Antonio's current child support obligation was $3674 a month (or $44,088 per year) and that he paid Elena maintenance of $5000 a month (or $60,000 per year).

¶ 48　　　　The record reflects Elena acted as the primary caretaker for Marco, the parties' "severely autistic" child. Evidence showed Marco was nonverbal and required constant supervision. As a result of caring for the parties' children both during the marriage and thereafter, Elena had not worked outside the home for nearly 30 years. On review, Antonio criticizes Elena's efforts to obtain employment so that she could become self-supporting, both when the parties' children were minors and after they became adults. First, the evidence supports a finding that the parties contemplated that Elena would be unable to work while Marco was a minor due to his autism. Specifically, the marital settlement agreement explicitly stated that the parties "anticipated that given [Marco's] disability *** and the amount of time and attention required of Elena as a result of such disability, Elena [would] be unable to obtain employment during [Marco's] minority ***." Antonio cannot fairly complain about circumstances that he anticipated and to which he agreed.

¶ 49　　　　Second, although Marco had reached adulthood, the evidence showed his need for care had not lessened. He required assistance with the activities of daily living and could not be left alone. Even when Marco was enrolled in a day program, such programs were not conducive to full-time employment for Elena, given both the hours of such programs and the unpredictability of Marco's needs. Below, the trial court specifically considered factors related to Elena's efforts to obtain employment and stated as follows:

> "The court finds that based on the testimony, evidence[,] and credibility of the witnesses[,] Elena's effort to become self-supporting has been reasonable considering the circumstances. Her ability to obtain employment outside the home is severely restricted as a result of her responsibilities to [Marco]. She obtains income for his caretaking; however, it is unreasonable to expect her to obtain full-time

- 18 -

employment. Although, in the event [Marco] enters into an appropriate day program, part-time employment may be a possibility."

The court's factual findings are supported by the record and not against the manifest weight of the evidence.

¶ 50    Regarding the earning capacities of the parties, Antonio agrees with the trial court's finding that it is "highly unlikely [Elena] could earn anymore [than] she presently received" as Marco's caretaker. However, he asserts this factor is ultimately "neutral" and does not weigh in favor of either party because he was earning less than he was at the time of dissolution, he had a major heart attack in 2018, and he "continues to have back issues that began when he was a practicing cardiologist." We disagree and find the record does not support Antonio's description of the evidence.

¶ 51    As discussed, the record reflects Antonio was earning a substantial income, comparable to what he was earning at the time of the parties' divorce. While working for Amgen from 2014 to 2018, his income increased each year. Further, although he had a heart attack in 2018, he testified that he did not lose any income and was fully rehabilitated. Finally, Antonio's testimony does not support a finding that he had "continued" back issues. Instead, he testified he had back issues while working as a cardiologist in Idaho and decided to "continue [his] career doing research." He provided no testimony that he suffered back issues that affected his current work with Amgen. Additionally, he earned substantially more income while working in the medical research field for Amgen than he did while working as a practicing cardiologist and having back issues.

¶ 52    On appeal, Antonio next points out that he has paid maintenance to Elena for a period of almost 20 years—double the length of the parties' marriage prior to their separation. He

- 19 -

asserts that under the current version of the Act, which was not in effect at the time of dissolution, guidelines require that the duration of maintenance is set according to a formula that is based on the length of the marriage. See 750 ILCS 5/504(b-1)(1)(B) (West 2018). Antonio argues that under the guideline formula, "Elena was entitled to maintenance for a period of [four] years and [four] months."

¶ 53        Initially, we note that even under the new version of the Act, a trial court is not required to order maintenance in accordance with the statutory guidelines and may deviate from those guidelines when warranted by the facts of the case. See *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 108, 128 N.E.3d 1237 ("The court is not required to order maintenance in accordance with the statutory guidelines."); see also 750 ILCS 5/504(b-1) (West 2018) (stating that if the court finds a maintenance award is appropriate it can order either guideline maintenance or nonguideline maintenance). When nonguideline maintenance is awarded, the court must "state in its findings the amount of maintenance (if determinable) or duration that would have been required under the guidelines and the reasoning for any variance from the guidelines." *Id.* § 504(b-2)(2). Here, the parties' situation, *i.e.*, their economic circumstances and the special needs of their youngest child, would almost certainly have warranted deviation from the duration provisions of guideline maintenance had the current version of the statute been in effect at the time of dissolution. In fact, at the time of dissolution, Antonio essentially agreed that Elena would be unable to work outside the home while Marco was a minor. Such inability to work significantly impacted her ability to be self-supporting and was a circumstance that the parties anticipated would continue for over 10 years after their divorce was finalized.

¶ 54        Further, to the extent Antonio argues that the duration provisions of guideline

maintenance under the Act should apply in this termination proceeding to restrict the duration of maintenance going forward, we disagree. In *In re Marriage of Harms*, 2018 IL App (5th) 160472, ¶¶ 30-35, 103 N.E.3d 979, the Fifth District addressed this precise issue and held that the maintenance guidelines under the new version of the Act, effective since 2015, were not applicable in proceedings to modify a maintenance order that was entered before the new Act was in effect. The court reasoned that the maintenance guidelines were found in section 504 of the Act, which applied to "proceedings involving *initial* maintenance orders." (Emphasis in original.) *Id.* ¶ 30. It noted that, in proceedings on petitions to modify or terminate maintenance, section 504 was relevant "only because it is referenced in section 510," which governs such petitions. *Id.* However, the court noted that section 510 explicitly referenced only section 504(a), setting forth various factors for consideration, and that it did "*not* refer to subsection (b-1) of section 504, which contains the new guidelines." (Emphasis in original.) *Id.* Accordingly, the court determined that under the express terms of the Act, the guidelines do not apply in proceedings brought under section 510 to modify or terminate maintenance. *Id.* ¶ 31; see also *In re Marriage of Kuper*, 2019 IL App (3d) 180094, ¶ 28, 125 N.E.3d 568 (holding "section 504(b-1)(1) does not apply to post-dissolution maintenance modification on review" and stating that if the legislature intended for the guideline maintenance formulas to be used to calculate modified maintenance amounts, it would have referred to the specific statutory subsection in which they were contained in section 510(a-5)).

¶ 55    We note that Antonio cites this court's decision in *In re Marriage of Kasprzyk*, 2019 IL App (4th) 170838, 128 N.E.3d 1105, to support his suggestion that the duration guidelines should apply in this case. There, the parties were married in excess of 20 years before their marriage was dissolved in 2014. *Id.* ¶¶ 3, 6. At the time of dissolution, the trial court ordered the

husband to pay maintenance for a period of two years but authorized the wife to seek an extension of maintenance before the two-year period expired. *Id.* ¶ 7. The wife filed such a petition before the two-year deadline. *Id.* ¶ 8. The court granted the petition and ordered that maintenance be permanent and, ultimately, the husband appealed. *Id.* ¶¶ 16, 20. On review, this court affirmed, holding (1) the wife sought to extend her maintenance through review proceedings rather than modification proceedings under section 510 of the Act; (2) the version of the Act in effect at the time of the filing of the wife's petition to extend maintenance is the version of the Act that applied, *i.e.,* the new version of the Act containing the maintenance guidelines; (3) the husband forfeited the argument that the "duration guidelines of section 504(b-1)(1)(B) *** do not apply when a party seeks review of a previously ordered maintenance award" because he did not raise it with the trial court or in his opening brief on appeal; (4) the court's decision to order permanent maintenance was authorized and not an abuse of discretion under the old statute or the new statute; and (5) the court did not abuse its discretion in finding the wife proved a continuing need for maintenance. *Id.* ¶¶ 23-24, 38, 39-40, 41, 49.

¶ 56 Like in *Kasprzyk*, we agree that the version of the Act in effect at the time Antonio filed his motion to terminate maintenance is the version of the statute applicable to his claim, *i.e.*, the new version of the Act. However, even the most recent version of the Act, section 510, which governs maintenance modification and termination proceedings, does not reference the maintenance guideline formulas of section 504(b-1). 750 ILCS 5/510(a-5) (West 2018). Significantly, *Kasprzyk* did not address the precise issue we consider here—whether the maintenance guidelines apply in proceedings brought under section 510 of the Act. In fact, we found a similar contention by the appellant, regarding the applicability of the guidelines, had been forfeited and declined to

consider it. *Kasprzyk*, 2019 IL App (4th) 170838, ¶¶ 39-40. Thus, to the extent Antonio suggests *Kasprzyk* required application of section 504(b-1)'s maintenance guidelines in this case, we disagree.

¶ 57 Ultimately, we find that *Harms* most closely resembles this case and find its reasoning and rationale to be persuasive. Although the duration of the parties' marriage was certainly a factor that the trial court should have, and did, consider when addressing Antonio's motion to terminate maintenance, the court was not required to apply the guideline maintenance formulas of section 504(b-1) in a section 510(a-5) proceeding. Accordingly, we find no merit to any suggestion by Antonio that the trial court should have limited Elena's maintenance to a period of four years and four months under the statutory guidelines.

¶ 58 On appeal, Antonio further complains that Elena exaggerated her monthly expenses on her financial affidavit. He contends that she alleged expenses and debts totaling $12,247.42 per month, but "the testimony and evidence presented to the [trial court] established monthly expenses [and debt payments] of $9991.11." Assuming, *arguendo*, that Antonio is correct and Elena's monthly expenses and debt payments total $9991.11, her monthly income from her work as Marco's caretaker ($49,944 expected in 2019 or $4162 per month) plus the child support she received ($3674 per month) would, without maintenance, be insufficient to meet those monthly expenses and debt payments (caretaker income $4162 + child support $3674 = $7836).

¶ 59 We also find that Antonio's financial affidavit is not without its own problems. On his affidavit, Antonio reported gross monthly income of $24,253.99; however, he acknowledged that figure did not include his yearly bonus, which totaled $94,330.46 in 2019. Consideration of Antonio's bonus would have added $7860.87 to his gross monthly income figure. He also reported

that his monthly expenses ($20,142.15 = $18,942.15 in living expenses plus $1200 monthly debt payments), exceeded his monthly net income ($10,027.03) by just over $10,000. Again, however, those calculations do not take Antonio's yearly bonus into consideration.

¶ 60          Further, when calculating his monthly deficit, Antonio appears to have counted his child support obligation twice. First, he testified at the hearing and argued in his written closing argument that his child support obligation was one of the *deductions* from his gross monthly income that he used to calculate his net monthly income. (As noted, one page of Antonio's financial affidavit is missing from the record. That page would presumably have contained an itemized list of his deductions from his gross income as it does not appear elsewhere in his financial affidavit.) On his financial affidavit he then also included his child support obligation ($3674) on his itemized list of monthly living *expenses*, ($18,942.15). Counting Antonio's child support obligation only once would either increase his net monthly income by $3674 or decrease his expenses by that same amount. Either way, Antonio's reported monthly deficit is either significantly reduced or non-existent when his yearly bonus is included within his calculation of income and his child support obligation is deducted only once from his income.

¶ 61          Here, the evidence presented indicates Elena would be unable to meet her monthly living expenses without Antonio's payment of maintenance. On the other hand, Antonio would appear to have income sufficient to meet his expenses even with the payment of maintenance to Elena.

¶ 62          Finally, on review, Antonio argues other factors that weigh in favor of terminating maintenance include the distribution of property and allocation of debts at the time of dissolution, as well as Elena's continued financial support of Andres. As Antonio points out, evidence showed

that in the marital settlement agreement, Antonio agreed to be responsible for all marital debts, totaling in excess of $156,000, and to pay Elena $94,720. Evidence also showed that Elena assisted Andres financially by paying his student loans, paying his car payment for a period of approximately six months, and sharing a bank account with him in which she deposited the money she received from the California program for taking care of Marco.

¶ 63　　　　　Here, the record clearly reflects that the court considered both the provisions of the parties' marital settlement agreement and Elena's financial assistance to Andres in reaching its decision as it specifically referenced these facts in its written order. Ultimately, however, it is apparent that the court determined other factors weighed more heavily in favor of continuing maintenance. In particular, in finding "that it would be unjust and inequitable to terminate or modify maintenance," the court stated as follows:

> "[Elena] continues to care for [Marco,] which requires significant and constant supervision. Antonio's gross income is $24,253.99 a month; however, this does not include annual bonuses. His March 2019 bonus was $94,330.46. He also received $35,924.57 in restricted stock for 2019. His gross income in 2018 was $420,224.28. Antonio's gross monthly income in 2018 was $35,018.69 and in 2019 is $32,114.86, not including restricted stock. He has limited debt. He contributes $2,425.41 per month to a voluntary retirement [*sic*]. He also pays $1,600 per month for his wife's Porsche. He stated he paid $1,398.00 per month toward attorney's fees. In 2016, he purchased a home in California for in excess of $1 million. Antonio's voluntary retirement contribution, wife's Porsche and attorney's fees payment each month total $5,423.41 alone."

- 25 -

The record shows the trial court considered the relevant statutory factors and that its factual findings were supported by the record. After reviewing the record, we find the court did not abuse its discretion in finding that termination of Antonio's maintenance obligation was not warranted by the evidence presented.

¶ 64                                                III. CONCLUSION

¶ 65          For the reasons stated, we affirm the trial court's judgment.

¶ 66          Affirmed.