2023 IL App (4th) 220983

NO. 4-22-0983

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 29, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| SUSAN M. CARBONE, | ) | Tazewell County |
|     Petitioner-Appellee, | ) | No. 20D396 |
|     and | ) | |
| ROBERT T. CARBONE, | ) | Honorable |
|     Respondent-Appellant. | ) | Stephen A. Kouri, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice DeArmond and Justice Knecht concurred in the judgment and
opinion.

**OPINION**

¶ 1        After a June 22, 2022, bench trial on the issue of maintenance, the trial court

entered an order awarding petitioner wife, Susan M. Carbone, a monthly amount plus a

percentage of the annual bonus of respondent husband, Robert T. Carbone. Robert filed a motion

to reconsider, which the court denied. Robert appeals, claiming the award of maintenance was

unwarranted given the circumstances. Specifically, Robert claims the court abused its discretion

in its award when, after proper consideration of the evidence and application of the statutory

factors, Susan had the ability without maintenance to meet her own financial needs. We affirm.

¶ 2                         I. BACKGROUND

¶ 3        In August 2002, Robert and Susan were married in Delaware. No children were

born or adopted during the marriage. In October 2020, after approximately 18 years of marriage,

Susan filed a petition to dissolve her marriage to Robert. At that time, Susan was 52 years old, and Robert was 50 years old. Both were employed at Advanced Technology Services, Inc. (ATS). In her petition, Susan requested Robert pay a reasonable amount in maintenance and contribute to her attorney fees and costs.

¶ 4        In February 2022, both parties filed financial affidavits. Susan reported a gross monthly income of $7220.60 in wages, plus $457.36 of bonus income, for a total of $7677.96. She reported living expenses of $8311.70. After taxes and payroll deductions, she reported a monthly deficit of $2505.50. Robert's financial affidavit reported a gross monthly income of $21,891 in wages, plus $11,584 of bonus income, for a total of $33,490. He reported living expenses of $5245.69. After taxes and payroll deductions, he reported a net monthly income of $17,782.03. In June 2022, the day before trial, Robert filed an updated financial affidavit reporting that his gross monthly income had increased to $22,547, but his bonus income had dropped to $9292, for a total of $31,584. His living expenses remained the same. His total net monthly income was reported at $16,145.72.

¶ 5        The parties had agreed on the division and distribution of the marital estate. The only issue unresolved was maintenance. On June 22, 2022, the trial court conducted an evidentiary hearing on the issue of spousal maintenance.

¶ 6        Susan testified that she was the payroll supervisor at ATS, earning approximately $89,000 per year. In 2022, she earned a "manager bonus" of $3055.45. In 2021, her annual base pay was $86,647.24, and her bonus was $5488.29. In 2020, her annual base pay was $81,228.86, and her bonus was $6780.17. She began her employment in 2006.

¶ 7        According to Susan, over the course of their marriage, the couple went from "budgeting in red for some time" to being "comfortable." Their financial means improved as

Robert transitioned from an hourly employee as a technician to a salaried employee, rising the corporate ladder to become vice president in 2018.

¶ 8 Susan testified that she remained in the marital home, which had an estimated fair market value of $160,000. There was no mortgage on this 30-year-old home. In addition to the property taxes and insurance, Susan said she had incurred expenses related to needed home repairs and maintenance. She described these expenses as "overwhelming." She drives a lien-free 2017 Nissan Maxima, while Robert drives an expense-free company car. She said they had agreed to divide evenly their retirement and bank accounts.

¶ 9 Susan had three associate's degrees but no bachelor's degree. She feared that, as an at-will employee, if she were to lose her job at ATS, she would not be able to earn close to her current salary elsewhere.

¶ 10 According to her May 2021 financial affidavit, Susan had approximately $154,000 in her bank account. Her February 2022 financial affidavit indicated that amount had been reduced to $77,000. Susan said she had to use the money for bills and expenses. She believed she would not be able to sustain the lifestyle she enjoyed during the marriage without depleting those funds. She said she never had to worry about debt during the marriage but, without maintenance, it was "absolutely" something that worried her moving forward.

¶ 11 Susan described the contributions she made in support of Robert's career and in the maintenance of the household, while he obtained his advanced degree and "climb[ed] through the positional changes" with ATS. She requested statutory maintenance in the amount of $2696.83 per month for 13 years and 10 months, plus a share of Robert's future annual bonuses.

¶ 12    On cross-examination, Susan acknowledged that, after distribution of the assets per the settlement agreement, she will have approximately $613,000 in her retirement account and a cash distribution from Robert in the amount of $127,242. And, she will have no debt.

¶ 13    Susan explained that, in less than one year, she spent $77,000 on "utilities, cell phone bills, insurance," and "grocery shopping, clothes shopping, trips to the doctor, trips to the vet. Normal expenses that [she] had had before." She acknowledged that in March 2022, she took a vacation to Cancun and, sometime after her separation from Robert, she had breast implant "replacement surgery." She estimated the surgery cost between $15,000 and $20,000.

¶ 14    Susan acknowledged that during the marriage, they lived comfortably but did not have a lavish lifestyle. Neither of them bought expensive jewelry, new cars, or luxury vacations.

¶ 15    Robert testified that during the pendency of the divorce, he purchased a home paying $409,000 with a $300,000 mortgage. Robert confirmed his 2021 salary was $261,471.69, and his bonus was $139,015. He said he typically received a 3% raise each year. According to his February 2022 financial affidavit, he had $16,145.72 of "total income available" per month. At the time of the hearing, he had $300,429 in his checking account.

¶ 16    Robert testified consistently with Susan, denying they lived a "luxurious" lifestyle during the marriage. He agreed they lived comfortably, even describing their lifestyle as "frugal."

¶ 17    Robert disagreed with Susan's characterization that her house was "falling apart." He said the roof was recently replaced and "virtually every room" had been remodeled. He disputed that Susan spent $450 per month for necessary repairs and maintenance on the home. He testified they did not have a cleaning service for the home during the marriage, though Susan now included that expense at $240 per month on her affidavit. He also disputed that she spent the

reported $1300 per month on groceries and $300 per month for the water softener, as he testified the water softener was leased for $60 per month. He also disputed her reported expenses of $500 for clothing, $150 for grooming, $817 for medical items, $155 for a club membership, and $850 for entertainment and dining out. He testified that their total living expenses during the marriage were between $4000 and $7000. They typically paid all expenses with their credit card and paid the balance off in full each month. Robert said he would have assumed Susan's monthly expenses would be lower as a single person than when they were married and both in the home. Accordingly, Robert claimed Susan's monthly expenses of $8300 were exaggerated and excessive.

¶ 18 On cross-examination, Robert admitted that Susan paid the monthly expenses, so he was not certain of the amounts. However, he said: "I have a good idea." He also admitted that he offered to pay for a house-cleaning service as a Christmas present to Susan.

¶ 19 On examination by the trial court, Robert testified that throughout a "good portion of the marriage," the household also included two children from Susan's prior relationship.

¶ 20 On July 12, 2022, after considering the evidence and arguments of counsel, the trial court entered a written order awarding Susan monthly maintenance for 13 years and 10 months in the amount of $2696.80, plus 21% of Robert's annual bonus income received during the term up to $125,262. The court found the parties "lived frugally" during their marriage and had "accumulated impressive equity and savings," which established "a 'standard of living' " that included the "security, gratification, and comfort in accumulating savings." Because Robert's 2022 bonus was paid to him after the valuation date of the marital estate, the court ordered Robert to pay Susan $23,682 as her share of the bonus as part of the maintenance order.

¶ 21 Robert filed a motion to reconsider, claiming the evidence presented at the hearing, coupled with the agreed division of marital assets and debts, did not support the maintenance award. He later filed an amended motion to reconsider, adding no new allegations but noting only that the trial court's maintenance order had been incorporated into the final judgment of dissolution entered on September 14, 2022. The court denied the amended motion to reconsider on October 20, 2022.

¶ 22 This appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24 Robert contends on appeal that the trial court erred in awarding Susan $2696.80 per month in fixed-term maintenance. In fact, based on the relevant statutory factors and the evidence presented, he contends the court erred in awarding Susan maintenance at all. We disagree.

¶ 25 Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/504(a) (West 2020)) sets forth factors for a trial court to consider in deciding whether to award maintenance. Those factors include, or relate to, the income of each party, the needs of each party, the earning capacity of each party, the standard of living established during the marriage, and the duration of the marriage. *Id.* § 504(a)(1)-(3), (7)-(8). No one factor is determinative once the court has determined some type of award is appropriate. *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 10. " 'When determining the amount and duration of maintenance, the trial court must balance the ability of the spouse to support himself [or herself] in some approximation to the standard of living he [or she] enjoyed during the marriage.' " *Id.* (quoting *In re Marriage of Shinn*, 313 Ill. App. 3d 317, 322 (2000)).

¶ 26    A trial court's decision to award maintenance is presumed to be correct. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 292 (2010). A maintenance award is generally reviewed for an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24. However, to the extent a factual finding behind a maintenance award is being challenged, that finding will not be disturbed on review unless it is against the manifest weight of the evidence. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 3. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, and not based on the evidence. *Id.*

¶ 27    " 'The benchmark for determining the amount of maintenance is the recipient's reasonable needs in light of the standard of living established during the marriage.' " *Nord*, 402 Ill. App. 3d at 293 (quoting *In re Marriage of Culp*, 341 Ill. App. 3d 390, 398 (2003)). A spouse is entitled to maintain a " 'reasonable approximation of the standard of living established during the marriage.' " *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 833 (1994). Where former spouses have grossly disparate earning potentials, financial self-sufficiency—which is just one of a number of statutory factors the court should consider—might not be required. *Id.* Accordingly, a former spouse is not " 'required to lower the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet his needs and the needs of his former spouse.' " *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 87 (quoting *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1044 (2008)). "Further, a spouse who lived frugally during a marriage is not required to live frugally following dissolution where the other spouse's superior earning power justifies additional maintenance and a resulting surplus of income." *In re Marriage of Fields*, 288 Ill. App. 3d 1053, 1062 (1997) (rejected on other grounds by *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325 (2002)).

¶ 28    As this court has expressed:

"The optimal goal of the maintenance act is for the dependent former spouse to become financially independent. However, under circumstances involving former spouses with grossly disparate earning potentials, this goal is often not achievable in light of the dependent former spouse's entitlement to maintain the standard of living established during the marriage. Hence, the goal of financial independence must be balanced against a realistic appraisal of the likelihood the spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage." *In re Marriage of Lenkner*, 241 Ill. App. 3d 15, 25 (1993).

¶ 29    Robert cites *In re Marriage of Bratcher*, 383 Ill. App. 3d 388, 392 (2008), in support of his position that Susan is not entitled to maintenance, despite their income disparity. In *Bratcher*, this court found maintenance may be reduced or eliminated based on the property division. We concluded it was not necessary to equalize the parties' income to maintain the standard of living enjoyed during the marriage. *Id.* "[M]aintenance is not the absolute right of every party to a marriage and should mainly be reserved for circumstances of necessity." *Id.* at 390. There, the property distribution, which the trial court divided almost equally and which amounted to several million dollars, was critical to this court's analysis. *Id.* at 392. The wife was awarded a $876,759 lump-sum payment as maintenance in gross, which we found eliminated any inequity. *Id.* at 391-92. In sum, we concluded that the award of maintenance to the wife was improper, considering the $1.6 million in assets awarded to her, many of which were income-producing. *Id.* at 392.

¶ 30 However, unlike *Bratcher*, Susan was not awarded any income-producing property as part of the distribution. Per the parties' settlement agreement, which was incorporated into the final judgment of dissolution, Susan received a $127,242 cash payment from Robert, an equalized retirement account with a balance of $613,000, and the marital home, having an equity of $160,000. Susan testified, as supported by her most recent financial affidavit, that she had a $2505.50 monthly deficit after expenses were paid. On the other hand, Robert's financial affidavit showed a monthly surplus of $16,145.72. With her reported monthly deficit, Susan would be required to tap into her assets, including her savings, to meet her monthly obligations.

¶ 31 Claiming both an abuse of discretion and a finding against the manifest weight of the evidence, Robert believes maintenance was unwarranted. He contends that the agreed upon division of assets, plus Susan's annual salary and bonuses, place her in a position of financial independence, despite her reported monthly expenses. Robert claims Susan's reported monthly expenses were unreasonable and inflated. Susan contends that Robert presented no evidence to support his theories. In fact, she argues, Robert admitted he was unaware of the monthly expenses paid during the marriage, as Susan took care of all the bills.

¶ 32 During the last few years of the marriage, the parties had a combined annual income of almost $500,000. However, the evidence presented at trial demonstrated that the couple did not live a lavish or luxurious lifestyle. They did not spend exorbitant amounts of money on a home, vacations, vehicles, gifts, or jewelry. They both testified they lived a prudent but comfortable lifestyle. With their frugality, they were able to accrue substantial savings and avoid debt. As the trial court found, their standard of living included "the security, gratification, and comfort in accumulating savings."

¶ 33        Susan would most likely never match Robert's earning power, and therefore, fixed maintenance was required for Susan to have "some reasonable approximation of the standard of living established during the marriage." See *In re Marriage of Cheger*, 213 Ill. App. 3d 371, 378 (1991). The record is clear that Susan would not be able to maintain the standard of accumulating savings and living debt-free without some assistance from Robert. Expenses for Susan's reasonable monthly needs were approximately $8000, which exceeded her monthly income of $5800. (Although Robert argues these expenses were not "reasonable," he presented no evidence in support.) Robert's monthly income from his salary alone was approximately $21,000, with living expenses of approximately $5000. Even without his bonus income, Robert was able to pay maintenance without greatly affecting his own standard of living.

¶ 34        Susan's salary, although significant at approximately $90,000, was not high enough by itself to allow her to maintain the same standard of living she enjoyed during the marriage as part of a household that had a $500,000 annual income. By ordering maintenance, the trial court was presumably not trying to equalize income, but rather, was trying to keep Susan in a similar position as she was during the marriage—comfortable and debt-free with accumulated savings.

¶ 35        The trial court considered the following relevant statutory factors: (1) the parties' respective incomes, (2) the apportioned marital estate, (3) the needs of each party, (4) the realistic present and future earning capacity of each party, (5) the standard of living established during the marriage, (6) the duration of the marriage, (7) the physical attributes of each party relating to his or her employability, and (8) any other just and equitable factors. In light of the evidence and those factors, we find the court's decision was not against the manifest weight of the evidence or an abuse of discretion. See 750 ILCS 5/504(a)(1)-(3), (7)-(9), (14) (West 2020).

¶ 36                              III. CONCLUSION

¶ 37          For the reasons stated, we affirm the trial court's judgment.

¶ 38          Affirmed.

*In re Marriage of Carbone*, 2023 IL App (4th) 220983

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, No. 20-D-396; the Hon. Stephen A. Kouri, Judge, presiding. |
| **Attorneys for Appellant:** | Judith A. Serritella, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Benjamin L. Mills, of Murphy & Dunn, P.C., of Peoria, for appellee. |